



ROBERT BAKER
2069 N  Beverly Glen Blvd
Los Angeles, CA  90077
310-746-6191
310-234-1241(fax)
In Pro Per
robertbaker.executor@gmail.com

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

CV19-1218-CAS (LAOx)

| | |
|---|---|
| ROBERT BAKER,  an individual | CASE NUMBER: |
|      Plaintiff. | |
| vs. | **PLAINTIFF'S FIRST COMPLAINT** |
| STEVEN A. GOLDMAN, Special Agent Federal Bureau of Investigation; BENJAMIN LICHTMAN, in his capacity as Assistant United States Attorney;  WILLIAM BARR,  attorney general for US. Department of Justice. LEAH T. WILSON, Executive Director of the California State Bar; And the CALIFORNIA STATE BAR | (1)  Sherman Act (15 USC §§ 1 and 2) (2)  Due process rights(14th & 5th amendments) (3)  RICO (18 USC §§ 1961 et seq). (4)  Elder Abuse  (Calif. W & I Code §§ 15600-15675) a) Disinherited; Probate code Section 259. |
|      Defendants. | |
| | (5)  Breach of Fiduciary Duty: Federal Fiduciary Rule: Fed. Regs.: 29 CFR Parts 2509, 2510, and 2550 (6)  Americans With Disabilities Act |

(42 USC § 12101 et seq.)
(7)  Violations of Securities Act
        1933-34(15 USC §§ 1 et seq)
    a . The Investment Advisors Act
        of 1940
        (15 USC §§ 78aaa through
            78111)
    b. The Securities Investor Protection
        Act of 1970
        (15 USC §§ 78aaa through
            78111)
(8)    False Pretenses /Conversion
(9)    Violations Under Color of
        Authority(Title 18, USC, Sect. 242)
(10) Fraud/Deceit
(11)  Professional  Legal Malpractice:
        Fraud
        (Business & Professions Code
            §6068)
(12)Fraudulent Concealment/Fraud on
        the Court
(13) Federal Torts Claims Act


(16) Declaratory Relief
(17)  Challenge to Sovereign Immunity
    (A)  Federal Bureau of
    Investigation
    (B)  U.S. Attorneys Office.


**DEMAND FOR JURY TRIAL**

### TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW,** Plaintiff ROBERT BAKER, individually; Plaintiff in the
above-titled cause and files this Complaint against Defendants: Christopher A.
Wray, Director of the Federal Bureau of Investigation("FBI") Steven A Goldman.

(GOLDMAN), Special Agent FBI; Matthew A. Wittaker(WHITTAKER), acting Attorney General of the United States' Benjamin Lichtman, Assistant US. Attorney of the US. Department of Justice (AUSA), Leah T. Wilson(WILSON), executive director of the California State Bar; and the CALIFORNIA STATE BAR respectfully bring his causes of action before this Court.

## I.   Nature of this Action

1.        This is an action that is brought for the purpose of protecting the Plaintiff for any civil rights violations, and other causes of actions, Plaintiff may have against the FBI, AUSA, and the STATEBAR for the savage actions they have committed against Plaintiff during the tenure from 2000 to the present time; currently, there are three appeals from a district court case number 2:16-cv-08434-GHW(FMo); Plaintiff discovered the AUSA involvement on February 27, 2017; and thus evokes an additional claim under the Federal Civil Torts Claim. While this federal statute is aimed at negligence issues, under some circumstances, intentional torts are covered. The issues in this complaint will be whether the ends justify the horrific consequences the means utilized by the governmental agencies. Plaintiff believes even Niccolo Machiavelli, author of The Prince, would be shocked by the behavior of the governmental entities to achieve their goals. The goal Plaintiff was informed by the special agent of the FBI was to clean up the corruption of the State Bar; Not to question the expertise or sophistication of either the FBI or the AUSA office but should it take over 12 years to fix the system culminating in the recently approved new Professional Conduct Rules(Rules) and regulations effective November 1, 2018 by the California Supreme Court. It is possible that the FBI and the AUSA came in earlier such as 2001 and therefore, the question is: does it take 18 years to fix the system. If it does, how corrupt was the system! One very interesting change in the case at hand, and the facts as enumerated in the factual allegations below that the

PLAINTIFF'S FIRST COMPLAINT FOR ,ADA, FEDERAL TORT CIVIL CLAIMS ACT.

, 3

FBI and the AUSA office has been very deceptive in their conduct, if not out flatly lying to Plaintiff and should not be tolerated by this Court.  Also, in all probability the Defendants in this complaint like the Defendants in 2:16-cv-08434-GHW (FMo);(Exh. 6)  will complain, again,  that this complaint is poorly drafted; they are correct, however, had the Defendants not interfered with the Plaintiff's previous counsel, first, the legal situation would have been resolved in an reasonable time manner, and second, the complaint would have been drafted by an expert in drafting federal complaints which require a certain expertise. The expert would draft the complaint to survive any Motion brought pursuant to Federal Rules Civil Procedure(FRCP) Section 12. Then, as in, 2:16-cv-08434-GHW(FMo) Plaintiff was compelled to draft Oppositions to Motions of some of the Defendants. Then Plaintiff was compelled to have three appeals which are currently before by the 9th Circuit. If the present compliant survives the Motions then the Plaintiff would be compelled to do   discovery such as, taking Depositions (Plaintiff has been the subject of several bogus, as defined by the Oxford English Dictionary(OED) of being "spurious, fictitious, sham", depositions such as in December 2001, and  2010 with the express intention that Plaintiff would break down but has personally never given any depositions), subpoenas, etc.  This is just one small percentage of the damage that AUSA thrust upon Plaintiff due process rights when they interfered in the legal situation.

## II.   Jurisdiction  and Venue

2.    The jurisdiction of this court is invoked and this action is instituted under the provisions of §§ 1331, 1332, 1337 and 1367 of Title 28. United States Code (28 U.S.C.  §§ 3331, 1332,1337 and 1367) and §§ 4.12 and  16 of the Clayton Act(15 U.S.C. §§ 15, 22, 26) ,  and  American with Disabilities Act(ADA)  42 USC  §§ 12101   based on  federal question , regulation of commerce and supplemental jurisdiction. It is brought to declare the rights of

Plaintiff to recover damages sustained by Plaintiff as a result of Defendants unlawful actions and to obtain injunctive and declaratory relief.

3.    28  USC § 1331 which gives districts courts original jurisdiction over civil actions arising under the Constitution , law or treaties of the Untied States

4.    28 USC § 1343 (3) and (4), and Sect. 1346(b) which gives district courts jurisdiction over actions to secure civil rights extended by the United States government.

5.    28 USC § 1367, which gives the district court supplemental jurisdiction over state law claims.

6.    The matter in controversy exceeds the sum or value of $75,000 exclusive of interests and costs.

7.    Venue is proper in the Central District of California under § 12 of the Clayton Act (15 U.SC. § 22)  and  under 28 USC §1391 because Defendant's FBI,  the AUSA  transact business and are found within this District.

## III.  Parties.

### Plaintiffs

8.    Plaintiff Robert Baker ("PLAINTIFF") was and is a resident of the State of California, County of Los Angeles during all times mentioned in this complaint

### Defendant

9.    Steven A. Goldman (hereinafter, "GOLDMAN"), special agent of the Federal Bureau of Investigation (FBI) formerly stationed at the Los Angeles office in charge of the white collar crime squadron.

10.    Christopher A. Wray(hereinafter, "Wray") is the Director of the Federal Bureau of Investigation.

11.    William Barr(herein,(hereinafter,  "BARR"), the attorney general of the USA

12.     Benjamin Lichtman, is an Assistant United States Attorney(Hereinafter, "AUSA)) for the US. Department of Justice for the Central District of California.

13.     State Bar of Calfornia(hereinafter, "STATEBAR' is an autonomous entity that regulates the practice of law in California.

## IV.   **Common Allegations**

14.     The common allegations for this lawsuit are lengthy, complicated and complex due to the factual content runs from 1985 to present day. Some of the factual content is given to help put some of the facts in context. Since the legal situation was not linear by any means, this mandated that the following be discussed in an interwoven and sometimes rather confusing set of circumstances. Plaintiff can appreciate the clarion call to clear up the corruption of the State Bar, the NASD(now FINRA), and the judiciary, but certainly not of the total denial of due process rights of Plaintiff, including violating Plaintiff's  ADA and Elder Abuse rights to name just a few. However, to help the Court to better understand the main legal dynamics that have taken and will take place Plaintiff presents the following.

## Ameriprise , Cohen's Involvement

15.     Plaintiff received a phone call from Stanley Cohen, an agent for Ameriprise,  in early 1996 and was told that Kate Baker had moved her monies to Ameriprise, which Plaintiff was already aware of, and Plaintiff should also transfer his monies. Plaintiff was convinced to transfer his monies from Bears Stearns and effectuated a transfer in the early part of 1996 from Bears Stearns to Ameriprise.  Plaintiff told Cohen what he wanted to invest in and Cohen stated he would. Jason Semeleng was an associate and assistant for Cohen during the time Plaintiff dealt with Cohen.

16.     Kate Baker died on January 28, 2000 at the age of 81 from pancreatic cancer. Plaintiff obtained the legal counsel of Maurice Katz(Katz) and I Richard Ruman(Ruman). After having paid Katz approximately $40,000 and Ruman approximately $32,000, for advice and service,   Plaintiff knew he had to seek an expert in the field of probate and Estate law. The last Will and Testament of Kate Baker(BAKER 1999) which had serious flaws in it according to forensic expert Howard Rile, Jr, had been drafted by attorney Callister.  When attorney Katz questioned Callister about the will in 2000 Callister stated to Katz that he had never meet Kate Baker nor had he ever talked to her on the phone. Plaintiff is aware of a Baker1994 drafted and signed by Kate Baker in the law office of Mitchell Silberberg & Knupp, LLP(MSK), but Plaintiff has never been allowed access to Estate file despite several subpoenas including two subpoenas sent by Plaintiff in 2012.  Attorney Ruman opened up a Probate in an attempt to get MSK, Cutrow, Callister, and Allen R. Baker(Allen)to  bring forth and probate the Baker1999. Eventually it surfaced and was entered into probate probably because Ruman made a deal favorable to Allen and MSK and not favorable to Plaintiff, in hindsight,  for obvious reasons.  As stated elsewhere the Baker 1999 was very suspicious according to forensic examiner Howard c. Rile, Jr.

## **Plaintiff's Psychology and  Psychoanalytic Training**

17.     Plaintiff believes that his training is relevant since the Defendants in other lawsuits stated that Plaintiff was "psychologically damaged" and therefore, Plaintiff's character was lacking. Plaintiffs, in the opinion of other courts and people, had illusions about being cheated by Defendants in this case and other Defendants in case 2:16-cv-08434-GHW(FMo)(exh 6),  etc. The Defendants in this case, took advantage of this "psychological damage" since the possibility of emerging from the emotional and mental state was at best slim to non-existent for

reasons explained further on and intentionally interfered with Plaintiff's most fundamental due process rights causing torts and criminal conduct to be covered up and civil damages and declaratory relief to be evaded.

18.    In June 1993 Plaintiff started to date a certain women who was both a psychologist and a psychoanalyst. After a few dates she suggested that Plaintiff take a class at the California Graduate Institute(CGI) where she was teaching then we would have a lot more in common to talk about.  Plaintiff's severe stuttering was clearly evident during our time together. Plaintiff's father, Ben Baker, had suffered a bi-lateral thalamic stroke which would within a few months cause his death in August, 1993. Prior to his father's death Plaintiff enrolled at CGI for fall classes.  Plaintiff choose the history and systems of psychology class which would begin subsequent to Ben Baker's death on August 21, 1993. As Plaintiff began to read the textbook, albeit very slowly, he began to really get into it  even though Plaintiff had at that time a severe thinking process disorder and low comprehension capacity.  Allen submitted as part of the legal papers in lawsuit(LC060762) in 2002) , an  affidavit(Exh.1) that Plaintiff was a professional student but more about this in due course. Allen was correct in that Plaintiff took a lot of classes and acquired a lot of degrees but the second part is entirely misinformed. Plaintiff only took classes/degrees beneficial for Plaintiffs business and professional interests. Second, always in Plaintiffs mind was what was the genesis of stuttering? Plaintiff registered for two more classes; abnormal psychology and the group therapy class everyone must take the first year.  During the group therapy class Plaintiff encountered two people who would be important in his life.  First, the leader of the class was Dr. Marvin Koven and one of the students in the class was Lauren Flicker, daughter of Dr. Marvin Flicker.  During the year of the class Lauren and Plaintiff would get to know each other and near the end of the year Lauren suggested to Plaintiff that Plaintiff take her father's, Dr. Marvin Flicker, class the Introduction to Psychoanalysis.  Although Plaintiff had

no thought of getting even his Master's degree in psychology and for sure not his Certificate in Psychoanalysis which CGI did have a program for, Plaintiff enrolled in several classes in September, 1994;

19.     Then on the fateful night of December 18, 1994 at 8:15 pm after the class came back from break after having during the break informed Dr. Flicker that Plaintiff would be asking a question being the last day of the class.  Plaintiff had found a sentence in the text we were using: "An Elementary Textbook of Psychoanalysis" by Charles Brenner, MD, on page 85, it sates, "Example of the consequence of such instinctualization are afforded childhood stuttering(inadequate neutralization ..)"  Plaintiff asked if this is true. Dr. Flicker responded that, "we now know that is NOT true but we don't know what is true." Dr. Flicker continued, "you have lived the experience why not find out". After a little prodding from Dr. Flicker and some friends Plaintiff  was now going to do his PhD dissertation in psychology to find out, if possible, what causes stuttering, if it is psychology/emotional and/or neurological or somewhere in between in its etiology.

20.     Dr. Brenner, a Freudian, in his textbook  does give Melanie Klein a reference in a footnote regarding that she views that the superego starts forming during the first year much earlier than the Freudian camp. This difference is why Dr. Grotstein, discussed elsewhere in this complaint, believed that Plaintiff could be psychoanalyzed by a BOR psychoanalyst but more in due course.

21.     Plaintiff was taking a class at CGI entitled "Ego Psychology" talked by the late Dr. Leo Rangel. Dr. Rangel had impressive credentials but was strictly a classical Freudian psychoanalyst having been very good friends with Sigmund Freud's daughter Anna Freud.  He had been the president of the APA and president of the IPA.  He had written several hundred articles and several books on various aspects of psychoanalysis.  During intermission of the class on one particular day Plaintiff asked him if knew any articles psychoanalytically based

written on stuttering.  He had been the editor of the major journals of
psychoanalysis and a grasp of   articles of the journals.  Dr. Rangel was not aware
of any article on stuttering and Freud had only approached it indirectly.(Recently
Plaintiff received  an article from a fellow colleague concerning Plaintiff's
research on stuttering.  Plaintiff discovered a book written by the late Dr. Stanley
Cobb in 1945, who headed  the neurology and psychiatry departments at Harvard
a long time ago, who had a favorable opinion concerning psychoanalysis and
stuttering , where he devotes an entire chapter on speech and language defects.)
Dr. Rangel advised Plaintiff to search every article on anxiety and there were a lot
of articles written especially by Dr. Rangel.  One day in December 2005, after
getting a dissertation committee together, Plaintiff was reading an article at the
Louis Darling Biomedical Library at UCLA  instead of Plaintiff just reading the
an article and close the journal, as well Plaintiff usual practice  on this particular
occasion Plaintiffs eye drifted down the page and saw the calendar for the lecture
presentations at the New York Psychoanalytic Institute(NYPI)  co-founded by
Freudian psychoanalyst Hanns Sachs in 1911.  Plaintiff's eyes started to read the
different titles of lectures and the third title stated, "The Mother in the Etiology of
Stuttering." Plaintiff had read hundreds of articles and not one used the word
"stutter". Plaintiff was very surprised that on   May 23, 1950, Dr.  Isadore Glauber
had delivered a lecture(exh. 2) at the NYPI. Plaintiff immediately went to the pay
phones located outside of the library and called the NYPI and spoke to a woman
who found the folder in the basement that still had the lecture which had been
typed on onion skin paper.  She informed Plaintiff that because Dr. Glauber had
died several years the folder was the property of the estate and unable to contact
anybody to get permission.  Plaintiff thanked her and immediately contacted the
airline to book him on the red eye.  Plaintiff landed in New York where it was
snowing.  After a few hours sitting in a café across the street of the NYPI when he
spotted a woman walking up the stairs to the NYPI. Plaintiff ran across the street

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and started to walk up the same stairs.  The women who had talked the previous day spotted Plaintiff as Plaintiff was walking up the cement stairs and welcomed him into the NYPI.  As she was explaining to Plaintiff that Plaintiff was not allowed to even see the folder, she told Plaintiff to wait upstairs so that she could check on the copier down stairs.  A few seconds later she appeared and informed Plaintiff that since he had come overnight, might as well let him see the folder and the paper, but do not copy it.  Plaintiff noticed that the copier was on and so Plaintiff, feeling like a thief proceeded to copy the paper.  The paper(exh. 2) is relevant for the ADA and Elder Abuse causes of action for both Plaintiff and the late Kate Baker. After which Plaintiff proceeded to walk up the stairs which were shaped in a circular way, and tried to walk past her.  She commented that it seemed from my face that "You had seen G-d" and she was correct in how Plaintiff felt. Plaintiff understood, having taken several psychoanalytic classes at CGI and knowing the vocabulary, especially of Melanie Klein, that the cause of stuttering was definitely emotional and was the result of family psychological dynamics, including the mother, as the title of the essay suggests.  There was no neurological deficit. The lecture did not say exactly want caused stuttering but that the mothers (and this was a study of 30 mothers) were definitely involved in the child's stuttering.(Plaintiff's research definitely agrees with Dr. Glauber's findings in many respects including the mother's involvement.)  Reminding this court that this was 1950.  The analytic research by BOR school that included Klein, Bion, Rosenfeld started to research and produce clinical essays regarding the connection between thinking and verbal thought disorders started in 1945 and continuing to the present day.  Plaintiff knew he had to come home start to find an analyst that specialized in issues for very early development. Plaintiff had been seeing Dr. Marvin Koven, since he had a M.S. in speech pathology and was a Certified Analyst and continued until Dr. Grotstein suggested Plaintiff try Dr. Jane Van Buren in May 2000.  Plaintiff choose to apply to the NPI on the advice of Dr.

Lawrence Hedges who was a teacher at both CGI and NPI.   Dr. Hedges and a few others strongly suggested to discontinue taking analytical courses from CGI and seek analytical training elsewhere. In the next couple of years working on the dissertation, Plaintiff attempted to have an external reader who had written a key textbook on stuttering, but when Plaintiff sent his first draft to the external reader Plaintiff was meet with outrage and anger, it seemed that the external reader who was professor and a speech pathology in the east coast was also a profound stutterer and could not deal with the fact that the mother of the stutterer may have been part of the underlying cause of the stuttering. The Chair of the Dissertation Department Dr. Leo Weisbender  compelled Plaintiff to go with another external reader, Dr. Daniel Zwitman.  Once the new external reader had read he strongly advised Plaintiff that if Plaintiff took out everything about the mother he would sign it; Plaintiff acquiesced and removed those parts.(Plaintiff is currently drafting a book based on his dissertation obviously including the mother's involvement and will be forthcoming).   In December 2007, Plaintiff went through his oral defense and was granted his PhD in Psychology. Although Plaintiff understood he had to go earlier and deeper into the very primitive areas of infancy to deal with his stuttering Plaintiff stayed with Dr. Koven until early January 2000. At that time with the passing of Kate Baker, it was time to change analyst and training institutes.  Even at this time Plaintiff had little or no understanding that he had a thinking process disorder(The Plaintiff is presently seeking Copyright permission to use an essay written by Dr. Lia Pistiner de Cortinas, a Bionian psychoanalytic expert, entitled  "The Origin and Nature of Thinking" in her book, "On Mental Growth".) Plaintiff will file an amended complaint to include the chapter and other necessary modifications generally that require the filing of an amended complaint. The chapter is an excellent interpretation of Bion's writing explaining the nature of thinking reminding this Court is central to understanding Plaintiff's disabilities. Bion's writing is known to be condensed and extremely complicated

to interpret as evident by reading his essay entitled, "A theory of Thinking" in
<u>Second Thoughts.</u>  Plaintiff is also seeking Copyright permission to use "A
Theory of Thinking" and will include that essay in an amended complaint also.
Thereafter, Plaintiff would discover and start on the process to transform and
eliminate the albatross around his life.

    22.    On or about May 4, 2000, a few months after Kate Baker died Plaintiff
contacted the late Dr. James S. Grotstein(Grotstein) for a consultation.  At the
consultation which took place in his office at his home we discussed getting into
another training psychoanalysis. Plaintiff had been in a so-called psychoanalysis
with Dr. Marvin Koven(Koven) for many years prior but several people, who
Plaintiff respected, strongly suggested getting into another training
psychoanalysis. Grotstein was an international renowned   psychoanalyst. He had
written hundreds of articles, many books especially on Dr. Wilfred R. Bion, whom
Grotstein himself had been analyzed by.  Dr. Grotstein had informed me a week
before when Plaintiff had scheduled the consult and at the consult that Dr.
Grotstein could not take Plaintiff on as a patient.  In hindsight, Plaintiff training
analysis was going to take a long time and Dr. Grotstein was approximately 73
plus years old then.   Further at the consult Plaintiff informed Dr. Grotstein about
Plaintiff's  previous attempts to gain admission into other traditional Freudian
psychoanalytic institutes in the greater Los Angeles area had not gone so well.
According to Dr. Grotstein the classical Freudian psychoanalysis was not suitable
for Plaintiff but believed Plaintiff could be psychoanalyzed by the British Object
Relations School(BOR) and especially the theories and techniques developed by
Melanie Klein, Herbert Rosenfeld and Wilfred W. Bion. Plaintiff and Dr.
Grotstein also discussed the legal situation with regards to how Plaintiff was going
to pay for the training psychoanalysis.  Plaintiff naively thought the legal situation
would end within a year or so. Plaintiff was aware at the time and would learn in
the future some of the famous actors, producers, writers and wealthy people Dr.

Grotstein had seen in his analytical practice. But more important Plaintiff understands, now, why BOR facilitated success in his own psychoanalysis and his own research and clinical experience  by being able to go to the very early primitive states of the infantile mind, which is where the issues that cause stuttering,  and autistic symptoms. After Dr. Grotstein and Plaintiff discussed who Plaintiff had recently interviewed, Dr. Grotstein recommended Dr. Jane Van Buren. Right after the consult Plaintiff contacted Dr. Van Buren and started a lengthy training psychoanalysis until her death in May, 2010.

23.     The only other stutterer that Plaintiff knows that had a psychoanalytic treatment geared to Kleinian analysis by Dr. I. Glauber was the late Dr. Winslow Hunt. Dr. Hunt had been certified by the NYPI and had an psychoanalysis by Dr. Dr. Glauber.   Many years ago, Plaintiff got the pleasure of meeting and getting to know Dr. Hunt who took up residency in Pocatello, Idaho.   Dr. Hunt tried when he was much younger to transform the minds of the speech pathology community to try the BOR School.  Dr. Hunt had a lot of success with his analysis but the stuttering community was hard pressed to try to be more flexible.

24.     Dr. Lawrence Hedges who taught the Plaintiff a few courses at CGI, suggested that Plaintiff apply to the Newport Psychoanalytic Institute(NPI) for training which Dr. Hedges was a co-founder along with Dr. Williams O. Erwin. Plaintiff applied and was accepted.  Dr. Jane Van Buren, in May, 2000, also suggested Plaintiff apply to NPI.

25.     During Plaintiff's lengthy analysis the subject of the legal situation would come up regularly in the year 2000 and until her death in May 2010.

26.     On or around May, 2002 Plaintiff was attending a psychoanalytic conference at the Los Angeles Psychoanalytic Institute(LAPSI) on Sawtelle Blvd in West Los Angeles. Plaintiff started a conversation with one of the interviewers that Plaintiff had back in 1996 from LAPSI.  He asked Plaintiff what Plaintiff was up to and Plaintiff informed him that Plaintiff was attending NPI. He asked

Plaintiff who his analyst was and Plaintiff informed him Dr. Jane Van Buren. The doctor strongly suggested that Plaintiff apply again to LAPSI(which would become several years later New Center for Psychoanalysis) and the application would be meet with an entirely different mindset.  Plaintiff discussed this with both his analyst and Dr. Grotstein and both saw it as very favorable.  During one of the interviews with Dr. Melvin Lansky in 2002 Dr. Lansky informed Plaintiff that he would be accepted as a candidate at LAPSI which is a member of the American Psychoanalytic Association(APA)(similar to what the American Bar Association is to law schools; an accrediting institution). Dr. Lansky knew from my application that Dr. Van Buren was Plaintiff's  psychoanalyst. Dr. Lansky knew Dr. Van Buren having been on a panel with her and stated that the two of us made a great analytical pair. The only problem that he could foresee was that under the APA rules, a candidate must be in a training analysis with a training analyst from the particular institute; here, being LAPSI. Dr. Lansky also discussed with Plaintiff that it may be possible that Dr. Van Buren jump through some hoops since she was a training and supervising analyst under IPA rules and become a member of LAPSI for Plaintiff's case only.  Dr. Lansky had done this for one of his patients who was going to PCC. Plaintiff discussed this with Dr. van Buren and in hindsight, the relationship between LAPSI and PCC owing to the relationship between Melanie Klein and Anna Freud was at best, similar to the cold war and can best be understand by reading the edited book of Pearl King concerning the Controversial Discussions between 1941-1945.

27.     In the process of applying to LAPSI, it came to Plaintiff's attention that the President of LAPSI was a women to whom Plaintiff had dated. She informed Plaintiff she was recusing herself due to a conflict of interest.  After being interviewed by three different doctors twice, plaintiff received a letter of acceptance from LAPSI with one condition: Plaintiff had to change his analyst to a member of LAPSI. The acceptance came with a list of possible analysts.

Plaintiff spoke to Dr. Grotstein who was familiar with the list of analysts who informed Plaintiff that all were classical psychoanalysts. After discussing with both Dr. Grotstein and Dr. Van Buren Plaintiff decided to keep going to NPI and prepare to submit an application for candidacy to PCC. PCC was founded primarily on the psychoanalytic principles of BOR. Plaintiff and Dr. Grotstein had discussed applying to PCC during the consult May, 2000 but Dr. Grotstein thought Plaintiff should wait a few years. Both Dr. Jan van Buren and Dr. Grotstein believed now was the proper time to apply to PCC. PCC is an affiliate member of the International Psychoanalytic Association(IPA). The IPA is the international governing-accrediting body for all psychoanalytic institutes around the world.

28.     Plaintiff made an application to PCC and after going through the interviews received a letter in the mail saying that Plaintiff had been rejected. To say Plaintiff was stunned is an understatement. Of course, Plaintiff discussed the situation with his analyst who was a PCC training and supervision analyst. Plaintiff decided to stay at NPI where Plaintiff was in his 3rd year of training. Plaintiff discussed with his analyst who would be good for the three supervision cases he needed as part of the training requirement. Also, discussed was retaining various supervisors that were specialists in BOR. Plaintiff did retain the supervisors at great costs to him using the monies from the sale of Plaintiff's home. Around 2005 Plaintiff got to thinking about the rejection at PCC. Dr. van Buren suggested Plaintiff speak to one of Plaintiff's supervisors who was there at the admissions committee meeting when Plaintiff application was being considered. During Plaintiff's supervision with Dr. Shirley Gooch Plaintiff brought up the issue of Plaintiff's rejection by PCC. Dr. Gooch asked Plaintiff if he knew Dr. Elizabeth Trewick and another psychoanalyst. Plaintiff responded of course, Plaintiff had gone on one date with her, she had been President of LAPSI and she recused herself when Plaintiff application was before LAPSI's admission

committee. Dr. Gooch then explained that Dr. Trewick was the Chairperson on the Admissions committee and she stated in no uncertain terms that Plaintiff had lied about being accepted to LAPSI as she had been President (and a graduate) of LAPSI at the time would have known. Also, another member of the admissions committee sided with her and Dr. Gooch stated that the other member had a questionable personality. Dr. Gooch then informed Plaintiff that Dr. Grotstein had been present at the meeting and called them "primitive savages". Also, Dr. Gooch explained that while Dr. Grotstein who had brought Dr. Bion over from England in the late 1950's, the power base by the year 2000 had changed to another group at PCC. Dr. Gooch explained to Plaintiff even if accepted at PCC they did not have a child psychoanalytic program and would not have one for almost a decade. Plaintiff was training at NPI to become a child psychoanalyst to help kids, adolescents and adults with stuttering, autistic symptoms. Dr. Gooch was and is a world recognized supervisor for autistic symptoms in the BOR tradition.

29.    Plaintiff during his tenure at NPI from 2000-2008, Plaintiff gained his training and clinical experience at the Valley Community Clinic(VCC) then in North Hollywood, CA. under the auspices of director Dr Eliane Hary, also affiliated with PCC. Although Plaintiff did see many patients/clients at the VCC Plaintiff spent a lot of time being loaned out to Glenwood Elementary School located in Sunland, CA. This position/internship was an unpaid internship like most internships are. In hindsight, Plaintiff was relying on the lawyers as listed on the complaint filed in federal lawsuit 2:16-cv-08434-GHW(FMo)(Exh. 6) to whom he had paid hundreds of thousands of dollars and the forensic accountant James Gill, CPA to whom he had paid roughly $150,000.00 to protect both Plaintiffs and the Estate of Kate Baker's due process rights and seek a resolution to the legal situation. It can be asserted that Plaintiff with a legal background should have known the AUS office was involved. Actually, part of the Plaintiff's thinking process disorder was the inability to integrate and connects facts.

Plaintiff's realizes now that Plaintiff <u>was merely considered collateral damage in the perspective and view of the AUSA office</u>.  Plaintiff had to sell his house in 2002 to pay for the attorneys, CPA and other basic human needed expenses because of the unlawful and tortious conduct of the defendants in this case and the Defendants in case 2:16-cv-08434-GHW( FNo)(exh. 6). Plaintiff was also paying for his psychoanalysis with Dr. Jane Van Buren, tuition at NPI, supervisors as detailed elsewhere in this complaint and, of course, also expenses such as Plaintiff's house, and everyday essentials, like food.

30.    Plaintiff's PsyD dissertation in psychoanalysis was on the transformation of an eight year old who had been diagnosed as autistic by the regional center of the L.A. United School District Regional Center. After several years of intense psychoanalysis the child had no autistic symptoms and had went from being in special education class to a magnet center at the middle school level.

31.    On May 5, 2008 the Plaintiff at the annual graduation ceremony for NPI was introduced as a psychoanalyst by one of his mentors, the late Dr. William O. Erwin. Plaintiff's Certificate of Psychoanalysis and PsyD in psychoanalysis diplomas are signed by various doctors including the training committee chair, Dr. Warren Procci.  Dr. Procci was the Secretary(at the time of the APA) and would be Vice President and President of the APA in due course.   Eventually, Plaintiff would be informed by his NPI colleagues  that Dr. Procci had attempted to have NPI accredited by the APA but because several of people on the Board who had graduated from NPI had neither been analyzed nor supervised by IPA or APA members would not step down from the Board. All of Plaintiffs supervision and training analyst were IPA and/or APA. Also, the fact that NPI curriculum included many courses centered on BOR did not go well with the APA.

32.    Dr. Van Buren had an untimely death in May, 2010 from surgery due to a brain tumor. If Plaintiff  had continued psychoanalysis with Dr. Van Buren for a

few more years and been able to further develop his thinking process  Plaintiff would have been able to make connections with facts much sooner than later. Plaintiff reminds this court that the late British Psychoanalyst famous for writing several books on the theoretical and clinical ideas of primitive states of mind and autism Frances Tustin had a 15 analysis with Wilfred Bion in London prior to Bion coming to Los Angeles in the early 1960's.   A 8-15 year psychoanalysis founded on BOR is not uncommon.

33.   Plaintiff's analyst Dr/ Van Buren suggested in session that Plaintiff apply to PCC to become a member. (Dr. Van Buren during the last month of Plaintiff analysis allowed Plaintiff to owe her any fees generated from that time on; as Plaintiff was out of funds as having spent monies, again, on lawyers' fees, etc.).  In the discussion Dr. Van Buren talked up the idea that PCC is a member of IPA, and that it would look more respectable then NPI which was not affiliated to either IPA or APA.  Plaintiff made application to PCC and Dr. James Gooch, world renowned BOR psychoanalyst, husband to Dr. Shirley Gooch, and co-founder of PCC informed me that he wanted to talk to Plaintiff in person.  As we meet in his office at his home, he informed Plaintiff and PCC would make Plaintiff a member if Plaintiff meet two conditions: 1) Attend infant observation for 9 months and 2) have one more adult case with supervision presumably with him. (Unfortunately, Plaintiff lacked the funds to have a supervision case since the retention of lawyers and forensic accounts had eating up Plaintiff's funds).  At NPI, Plaintiff had two child cases with supervision, one with Dr. Katina Kostoulas(IPA-PCC-NPI) and another with Dr. Shirely Gooch(APA/IPA-PCC). Plaintiff adult case with supervision was with Dr. William O Erwin(APA/IPA-PCC-NPI). PCC had, in fact, accepted all seminars, supervisions, and psychoanalysis with Dr. Van Buren.

34.   Plaintiff, on an intermittent basis between  2011-2013 was forced to borrow money from friends to pay attorney fees, as well as, living expenses and

offices expenses.  Plaintiff points this money issue out to this Court as an illustration of how malicious the AUSA conduct affected Plaintiff who was suffering from disabilities covered by ADA and Elder Abuse act.

### BYAM, HAHN, Mitchell Silberberg & Knupp(MSK) Involvement

35.     Plaintiff contacted attorney Maurice H/ Katz(Katz), who Plaintiff had known for a considerable time as his corporation law professor at USFV, College of law to deal with the Estate of Kate Baker attorney Allan B. Cutrow. Being that attorney Katz was a corporate lawyer, he advised Plaintiff to allow him to bring in his friend attorney I Richard Ruman(Ruman).  After attorney Katz had contacted several people as explained elsewhere in this complaint, he had attorney Ruman open up a Probate.  After Ruman researched an Irrevocable trust as a revocable trust and filled out the probate papers in ink, Plaintiff believed that Ruman was just incompetent and needed to retain new counsel, although in hindsight understands that he may ;have  chosen to play ball with attorney Cutrow.  One of the consequences of the interference by the AUSA with not allowing Plaintiff to have representation, since counsel would not have dismissed I Richard Ruman with prejudice in 2017 nor Robert Altman(Ret. Judge) dismissed with prejudice also in 2017 in federal case 2:16-cv-08434-GHW(FMo).

36.     Plaintiff contacted Clark R. Byam of Hahn.  Plaintiff asked Byam if he knew Allan Cutrow (Cutrow) who was a partner at MSK, and he stated he did. Plaintiff made an appointment to meet with Byam.  Prior to the meeting, Plaintiff sent all of the legal documents he had obtained to Byam for review.

37.     At the first meeting, Byam suggested that after his review of the documents Plaintiff had sent him he would render his advice.  His advice was: first, he would get the documents necessary to see if Plaintiff had a case against

Ameriprise and, second, he wanted to set up a meeting with Cutrow and Plaintiff's brothers Allen and Frank.  A meeting was arranged.  After many months went by, Byam stated to Plaintiff that he had received the documents.  By the time Byam informed Plaintiff that he had received documents, Plaintiff had already decided to have Davis represent Plaintiff in any lawsuits against Ameriprise entities and not Byam of Hahn. In hindsight and with a keener awareness in thinking this probably made attorney Byam extremely upset, that Byam decided to come over to the side of MSK, Allen and Frank as the facts/evidence definitely demonstrate.

38.     During the summer of 2001, William C. Garr of Hahn called Plaintiff to suggest a meeting to discuss their representation of Plaintiffs against Ameriprise entities. He told Plaintiff that he, Byam, and their expert had reviewed the documents and believed Plaintiffs had a strong case against Ameriprise entities. He explained on the telephone that they had never done a securities arbitration case but that he could keep it in the U.S. District Court.  Garr did say he would send Plaintiff some promotional material.  Plaintiff received the promotional material within a few days.  He also stated to Plaintiff that he would send Plaintiff a few names of securities arbitration specialists since Plaintiff was hesitant about Hahn representing him in a securities case in arbitration. Attorney Garr referred Plaintiff to Philip Aidikoff.

39.     By this time in late 2001,  Plaintiff had meet with Davis and after Davis had reviewed all documents and had Katie Baker(not related to the decedent Kate Baker) also to review documents wanted to represent Plaintiff in bringing a lawsuit against Ameriprise entities for recovery on Plaintiff's personal account and the  Estate monies; the Baker Family Trust  & Baker Family Partnership. .

40.     In December, 2001 Byam suggested that there be two depositions, one of Plaintiff and one of Allen. Plaintiff suggested a deposition of Cohen but Byam instead stated that could occur if a settlement could not be reached at the mediation.  The depositions would be confined to the Plaintiff's personal account

at Ameriprise entities and then there would be mediation for a possible global settlement. At the mediation Byam strongly suggested that Plaintiff settle with Allen and Frank and enter into a Settlement Agreement. The settlement was an agreement between Allen, Frank, and Robert Baker as partners, executors and trustee of the various family entities; part of the Settlement Agreement was to set up the Robert Trust at CNB. After the settlement Plaintiff was to bring an action for claims against AEFA and Cohen. The settlement agreement of 2002, specifically excluded from release AEFA and Cohen. (The Court is referred to elsewhere in this complaint as to the validity of the Settlement Agreement of 2002 in light of the November 18, 2013 probate ruling.)

41.     At the May 30, 2012 Superior Court hearing in Case #BC394851,  the Judge Susan Bryant-Deason strongly implied that Hahn  may have received  and reviewed  documents pertaining to the Baker Family Trust and Baker Family Partnership  without disclosing or advising Plaintiff of such and serious accounting issues which is a violation of Professional Conduct code.   Part of the Settlement agreement was to create a Robert Trust and to have CNB be the trustee, in that in 2007, Plaintiff sought to terminate the Robert Trust at City National Bank(CNB) and would eventually lead to legal malpractice  lawsuit and discovery of Byam's perjury. It also leads to a report that Plaintiff filed against CNB for their unethical conduct and elder abuse while trustee.  The report was filed with the federal regulators who regulate national banks: Office of the Controller of the Currency(COTC).  As far as Plaintiff is aware the investigation is ongoing. In fact, during Plaintiff's deposition by attorney David Long who was representing Byam and Hahn & Hahn he asked Plaintiff a question concerning the complaint Plaintiff had filed with the COTC.  Mr. Long was very surprised that there was still an investigation of CNB by the COTC was still apparently on going.

42.     Plaintiff did receive a few names from William Garr of Hahn & Hahn of securities arbitration specialists in a few days along with the promotional material. Plaintiff decided to call and interview Aidikoff, one of the names of an expert in securities arbitration.

43.     Plaintiff made an appointment and at the meeting gave Aidikoff a history of the case which up to that point in 2001 was basically some information about AEFA management of the money and a detailed family history.  Aidikoff recommended that his office requests documents from AEFA on the Plaintiff personal account account.  Plaintiff appreciates that Aidikoff may have already had some documents from either Hahn and/or MSK that they received from AEFA counsel as stated in the Ameriprise Subpoena Objection stated below. Aidikoff stated he knew Cutrow from being involved with the Jewish Federation of Los Angeles. Aidikoff's requested some documents from AEFA.  The documents for the Plaintiff's personal account came within a few months; more importantly, Aidikoff and his associates could see that Plaintiff had some communication  problems and learning disabilities   Aidikoff declined representation saying  the fact that Plaintiff would not be dependable witness in an NASD arbitration.  In September, 2011, Mahavier did contact and discuss the legal situation again and supposedly Aidikoff agreed to be an expert according to Mahavier.  Jane Baker's prepared  taking a tremendous amount of time a detailed summary with 2 CD's composed of hundred of AEFA's documents which was sent to Aidikoff. Plaintiff's asserts that AUSA was somehow involved   eventually to accomplish certain goals such that culminated for the publics consumption , at least, in the Professional Rules of Conduct made effective November 1, 2018  but continuing the Elder Abuse and violating the ADA for both the Estate of Kate Baker and Plaintiff.

44.     At the same time that Plaintiff was meeting with a family friend who was also a CPA and a stock broker, Robert Fenton, referred Plaintiff to the woman

who had been his instructor to help him pass the stockbrokers tests,  Katie
Baker(not related to the late Kate Baker) . Plaintiff spoke to Katie Baker who
would refer Plaintiff to Davis in due course.

### Davis Involvement

45.     When Aidikoff declined representation of Plaintiff, Plaintiff called
Davis and set up a meeting.  Davis gave all of the documents to Katie Baker who
was a specialist in securities.  After a detailed review of all documents which
include Baker Family Trusts, Baker Partnership, Davis advised plaintiff he would
file a lawsuit against Ameriprise and Cohen for damages of the RB Trust only.

46.     Plaintiff did discuss with Davis Plaintiff was in psychoanalysis with Dr.
van Buren since Davis's sister-in-law, Sunny, was also in psychoanalysis with Dr.
Van Buren and a candidate at PCC. Eventually, Davis would get divorced and his
ex-wife would be in psychoanalysis with Dr. Van Buren and a candidate at PCC.

47.     Davis filed the initial Superior Court lawsuit case # LC060762 in
2002(exh. 3).  The Defendants in LC060762 filed a Motion to Compel to
Arbitration and also a Motion to be relieved of liability due to the fact that they
were only custodians of the money. The Reply to the Motion to discharge
Ameriprise from liability included two Affidavits: one from Allen R. Baker(exh.
1) and one from Defendant in that case Stanley R. Cohen(exh.4). The relevance of
the affidavits were to destroy the Plaintiff's character which was accomplished in
the court in LC060762, 2 Ca. Court of Appeals cases, the Ca. Supreme Court in
and the US. Supreme Court all enjoyed the ruminations of both Allen and Cohen
without any evidence to the contrary. Plaintiff's wonders what the AUSA office
involvement with the various states higher courts and the US Supreme Court with
regard to the appeals from LC060762 was? Now comes the facts showing both
affidavits were complete falsehoods and without substance.

Stanley R. Cohen's Affidavit

48.      Stanley R. Cohen states in his affidavit(exh. 4):  (Point of information: Cohen during the time Plaintiff dealt with him had a severe stutterer. Plaintiff during the time Plaintiff dealt with Cohen also had a severe stutterer). Plaintiff points out to this court the fact that the lecture(exh. 2 which also includes the authors obituary showing he was an expert on speech disorders) by Dr. Glauber will be relevant to understand Cohen's mother who is a witness of the purported 1999 Will of Kate Baker(Baker1999). Plaintiff still is unable to see the Will of Kate (Baker1994) drafted by attorney Cutrow.   Plaintiff, also, offers for the court to help understand the emotional and mental dynamics that Cohen was functioning under while handling the accounts is the lecture (exh. 2) given by Dr. I. Peter Glauber at the New York Psychoanalytic Institute(NYPI) on May 3, 1950. Kate Baker's emotional and mental dynamics can be better understood from the lecture by Dr. Glauber for all times relevant. The NYPI is Freudian based. Plaintiff was informed by Allen that Allen had been referred to Cohen through his CPA Paul Berg. Cohen states that he served as Kate Baker financial advisor from 1991- to her death on January 28, 2000.  The record is clear that the Baker Family money was transferred from Bears Stearns in late 1995. The funds of the Robert Baker Trust(RBT) were transferred by Plaintiff in early 1996 not by Kate Baker. This could be testified by former account executive at Bear Stearns and now at Oppenheimer Harold Yeoman.  Plaintiff had complete control over the RBT from 1985-1999.  In 1999 a check written by Plaintiff to purchase a car bounced the first time because Cohen forget to transfer money and thereafter, to cover up his incompetence he made up a story. Perhaps, Cohen and Allen were getting reading to prepare to finalize the elements needed to complete the scheme they had been planning for years and intentionally bounced the check?   Plaintiff was not aware of the actual Trust document until February 14, 2000 when Allen faxed him a copy of the RBT document(exh. 5).  The RBT drawn up by attorney Cutrow was supposed to be a Totten trust but attorney Cutrow who was also the attorney for

Baker needed to protect Allen who was obviously going to outlive Kate Baker. Plaintiff had complete authority to manage the account and to liquidate the account as shown by the constant putting in and withdrawing monies to the account while at Bears Stearns and at Ameriprise. Cohen states in the Affidavit that Plaintiff provided Cohen with a copy of the Trust document. That is impossible since Plaintiff was unaware of the trust document until February 14, 2000. Cohen did visit Kate Baker often during 1996 to Feb. 1999 and discussed only the Baker Family accounts not Plaintiffs account according to what Kate Baker informed Plaintiff of during that time. Cohen usually came on Monday morning. Cohen would show Kate Baker account documents that seemingly showed that they accounts were making a great deal of money; this, in insight, would demonstrate that the account documents had to be fabricated since it is now known through the documents furnished by the successor of American Express Tax and Business Services, Inc. McGladreys CPA"s that Cohen was criminally/tortuously funneling millions of dollars to Allen R. Baker Family Trust accounts. In contrast to statements made by Cohen in his affidavit, the documents clearly show that except for the initial funding of the RBT which was 1/3 of the funds(1/3 went to each son) of what was received for  Kate and Ben Baker portion for the sale of Apex Wholesale Produce, Inc. in 1985 to Fisher Partnership Plaintiff deposited the rest of the funds into the RBT. Since Plaintiff was not married as his other two brothers were Plaintiff was informed by Kate Baker that she was funding an account at Bears Stearns so if Plaintiff should die or become incapacitated then Kate Baker could have access to account funds.  Plaintiff transferred the monies received for the sale of the Woodland Hills townhouse which was in his own name and deposited the funds into the RBT. Cohen states that Plaintiff did not have authority to liquidate the RBT.  After Kate Baker was diagnosed with terminal pancreatic cancer, and the check bounce, Kate Baker, in fact, requested Plaintiff to liquidate the RBT. When Plaintiff attempted to

liquidate the RBT was unable to do it. It wasn't until late February, 2018 when Plaintiff was able to some degree comprehend and understand Kate Baker state of mind when she was informed that she had pancreatic cancer was when Plaintiff was informed that he had oral cancer. Plaintiff was almost immediately advice Plaintiff cancer was fully treatable  through 35 sessions of radiation and 7 weekly Erbitux treatments whereas Kate Baker's diagnosis was a death sentence although the treatment of radiation and Erbitux was vicious and challenging to say the least, Plaintiff had a stage I oral cancer but was treated as if he had stage 4 for that is the philosophy of the cancer community.  Kate Baker's treatment was useless and without any redeeming merit. Plaintiff's treatment proved successful.  Plaintiff asserts that Allen pleaded with Kate Baker to go through the useless treatment was merely to make sure that the scheme hatched between Cohen and Allen could be finalized.

49.     The next subsection of the affidavit deals with Plaintiff trying to liquidate the trust.  Again, Plaintiff had full access to the RBT account since contrary to Cohen assertions, and Plaintiff exercised full and unequivocal control over the RBT funds from 1985-1999. At the beginning of 1999 Plaintiff purchased a car to celebrate to finally celebrate his receiving his PhD in psychology.  The dissertation was entitled, as previously discussed elsewhere in this complaint: Stuttering: the etiology of the phenomena from a psychoanalytic perspective.

50.     The affidavit states that Cohen called Kate Baker several times in January, 2000 and each call went unanswered.  During January, Kate Baker advised Plaintiff several times to call AEFA home office and try to liquidate the RBT which Plaintiff did. Plaintiff was informed by American Express to talk to Stanley Cohen.   On February 14, 2000 in the process of trying to deal with the passing of Kate Baker, Allen called Plaintiff and stated, "We fucked you and you can't do a damn thing about it".  Plaintiff asked "who is we?"  Allen's response

was, "Stanley Cohen and I". Within minutes Allen faxed Plaintiff a copy of the RBT which is  Exh. 5 showing the date it was faxed.

51.      Cohen right after Tad Callister, who supposedly   drafted the Baker1999, on the very day Kate Baker had been diagnosed with inoperable pancreatic cancer had her sign the Baker1999. When attorney Maurice H. Katz spoke to  Callister  he admitted to Katz that Callister had never spoken to Kate Baker, meet in person nor knew who she was, Cohen had everything he needed and therefore, ceased visiting Kate Baker. Kate Baker was almost comatose for most of January, 2000. On December 20, 1999 Kate Baker discontinued treatment, went home having decided for hospice care.

52.     In Cohen affidavit the next section is "Allen Becoming Successor trustee: The statements that Cohen makes are false in that Cohen knew that Plaintiff deposited most funds into the RBT except for the original funding coming from the sale of Apex Wholesale Produce, Inc//

53.      Plaintiff attended the business meeting at Cohen's office in Woodland Hills about a month after Kate Baker's death. This was after Plaintiff had been faxed a copy of the RBT. At the meeting was Cohen, Frank, Allen, Plaintiff and Jason Semelong, Cohen's assistant.  Allen became extremely angry at Cohen and Cohen told Allen" don't yell at me, I am getting another migraine headache." In hindsight,  Allen was just trying to cover up the millions of dollars he had stolen from the Baker Family assets with the assistance of Cohen.

54.     Plaintiff asserts that the rest of Stanley R. Cohen's affidavit is made up of statements whose sum and substance are false.

55.     Has the AUSA or the FBI taken a deposition of Stanley R. Cohen which Plaintiff is entitled to receive a copy to view.


Allen R. Baker Affidavit

56.     Plaintiff will now deal with Allen R. Baker's affidavit (Exh. 4): Allen
states in the background subsection that Plaintiff is a professional student. If being
a professional student is to have a negative connotation, in fact,  Plaintiff never
took an extraneous course that Plaintiff could not be used for personal or
professional growth or in the earnest attempt to find the cause for stuttering which
Plaintiff felt was like an having an albatross around his life.  Also, the so-called
cure for stuttering wasn't in the mindset of Plaintiff.  First, Allen states that
Plaintiff went to law school but never passed any bar.  Plaintiff did go to the
University of San Fernando Valley, College of law(USFV). Plaintiff
acknowledges he went through law school unknowingly with a thinking process
disorder.  Plaintiff is glad Plaintiff  did so in that Plaintiff can be familiar with the
legal process which has come in handy when Plaintiff was compelled to go In Pro
Se in 2012.  The knowledge he has acquired has helped him through the present
time including drafting this Complaint.  Also, Plaintiff did pass the Georgia State
Bar and Utah State Bar back in the 1980's but has since given up his licenses in
both states.  Plaintiff's mind set after having passed the bar in Georgia and Utah
was to stay in Los Angeles and be assistant to attorney Esther Kascle. When
Plaintiff meet with FBI special agent Steven Goldman and was informed that the
state bar is corrupt, perhaps the corruption extends to the administration of the
state bar examination which Plaintiff took many times:  such as in the grading
process so if you graduated from an ABA accredited school you had a much
higher percentage of passing even though the USV college of law was on the same
par as many of the ABA accredited law schools. Shortly after Plaintiff passed his
first year of law school, attorney Aaron Shelden suggested to Ben Baker,
Plaintiff's father,  that Shelden could get Plaintiff into Southwestern Law School
for a small sum of money. Attorney Shelden understood that Southwestern Law
School(SW) was an ABA and the USFV was not.  It was also known that in the
first year of Plaintiff  aw school in 1973, the USFV administration had  attempted

to get accreditation from the ABA as a proprietary school, but it would be a few years away until such proprietary law schools would be able to get accreditation. The offer of getting Plaintiff into SW never panned out.

57.     Plaintiff does have a MS(finance) and an MS(tax) from Golden Gate University(GGU)both of which had been very helpful when Plaintiff was working between 1975-1984, thereabouts, with attorney Kascle. The background of MS(Finance) and MS(tax) has, also, been very useful in working with Plaintiff's patients who Plaintiff sees as an Authorized California Gambling Education and Treatment Services Program(CalGETS) Provider (through CA Dept of Public Health), in partnership with research conducted through the UCLA Gambling Studies Program.  Research results demonstrate Plaintiff's British Object Relations approach to be extremely successful with the problem and addicted gamblers, whereas other treatment modalities, such as traditional cognitive behavioral therapy, are not. Also, Plaintiff received a BA degree from Loyola Marymount University(LMU) in English in 1980. The courses taken were, of course, to help the Plaintiff read, writing and thinking so important for personal and professional growth.  Also, Plaintiff is proud of his PhD in psychology and his PsyD in psychoanalysis.  The dissertation for his PsyD in psychoanalysis was helping a 7 year old to go from special education with severe autistic symptoms to magnet school with no sign of autistic symptoms. This past sentence is not to glorify Plaintiff but to show this Court and the Defendants the potential when the right psychoanalytic  treatment is provided: BOR

58.     Allen R. Baker makes a statement #4 that everyone knew about the RBT document which is totally false.  It is quite interesting that if Kate Baker had wanted to establish a RBT as it was drafted by attorney Cutrow, Kate Baker would have probably had the Baker Family Trusts and Partnership for Allen and Frank only, and put Plaintiffs inheritance into the RBT which she DID NOT. Plaintiff is entitled to see the Baker1994 and yet still has not been allowed to see

the Baker1994 let alone the entire Estate file. Plaintiff questions whether the AUSA or the FBI involvement has resulted in the denial of Plaintiff having access to the Estate files and account documents.

59.     Plaintiff, contrary to what Allen asserts, had filed state and federal tax returns for all years relevant.

60.     Plaintiff worked for public accountant Ben John Woods for about ten months after Plaintiff graduated from CSUN. Plaintiff then went to law school full time. After law school Plaintiff got a job with Esther Duffy Kascle who was both a lawyer and a CPA. Plaintiff worked for attorney Kascle for about 6-10 years primarily in the area of tax, but also did some paralegal work for her: sometimes part time and sometimes full time. Allen Bakers memory must be deficient about Plaintiff's working for Kascle in that he hired her for a very brief time to make sure that Kascle would have a conflict of interest in representing Plaintiff from the beginning so as not to be able to represent Plaintiff. In 2008, after Plaintiff became a Research Psychoanalyst Plaintiff started to further his research and clinical experience into stuttering and autistic systems. The funding of lawyers fees, etc caused a serious financial drain on Plaintiffs assets to which Plaintiff needed to terminate the Robert Trust at City National Bank(CNB). The AUSA office had come into the legal situation long before this time and wonders what the AUSA and the FBI involvement with the COTC and other governmental agencies were.

61.     Several years went by and Plaintiff's psychoanalytic research and clinical experience picked up. Plaintiff's research and clinical practice has allowed Plaintiff to pay the court filings fees, the printing costs, the service of the various legal documents such as legal complaints including this complaint.

62.     The rest of Allen R. Baker's affidavit is made up of statements whose sum and substance are false.

<center>Compel to Arbitration</center>

63.     The Ameriprise and Cohen moved to compel to arbitration.  In the initial lawsuit, Davis sued for only the RBT account informing Plaintiff that he would later add the Estate when he would file in the NASD.  Davis may have been cooperating with the AUSA as earlier as filing of LC060762, if not, Davis's penalty should have been disbarment and Davis is now listed as "inactive" as of January 29, 2019. Is this because of his age or is the State Bar finally investigating him? When the court compelled the case to arbitration Davis specifically asked the court to stay the case until after the NASD ruling specifically to give Davis discovery since the NASD lacked discovery power which he knew was not true. Davis filed the initial complaint in the NASD but did not name the Estate as a party.   In the amended complaint in the NASD, Davis did add Plaintiff as a beneficiary saying that was sufficient to collect damages for the Estate.   Davis voluntarily dismissed the superior court case in January, 2003 without informing Plaintiff. By late 2003, Davis advised Plaintiff he needed to get out because he was ill. The agreement with Davis was for 20% on contingency and a $10,000.00 non-refundable fee. Thus leads to the inference was Davis as early as 2001 cooperating, if that is the right word, with the FBI and/or the AUSA?

## **Bennett & Fairshter(B&F), Dykema & Richardson & Patel(R&P) Involvement**

64.     Plaintiff was recommended to B&F by William Comanor(Comanor). Comanor was a long time good friend of Bennett of   B&F. Comanor was also a very long time good friend of Donahue a partner at R&P. Phan was the general managing litigation partner at R&P during their representation of Plaintiff. Jody Borrelli was an associate in the law office of R&P at the time of their representation of Plaintiff. Robert  Liskey was an associate at R&P at the time of their representation of Plaintiff.   Comanor had learned a great deal about the case from his then wife, Joan Miller. Plaintiff meet Joan Miller as a colleague at a mental health clinic where both were doing internships.   In late 2008, Plaintiff

would learn by way of the State Bar  website that at the time of the Comanor
referral in 2004, B&F had embezzled millions of dollars from their clients through
forgeries and creating conflicts of interests in at least two other cases that B&F
were handling for other clients.. Had the Plaintiff known that  or  the  State bar
were required that each lawyer inform their existing clients and/or future clients
that an ongoing investigation(s) was in progress on the individuals Calbar site
page, Plaintiff would never have retained them

     65.    In September 2004 Plaintiff meet with B&F for their initial meeting,
B&F took a complete legal and securities history.  In September, 2004, Jane Baker
reviewed the original Superior Court file (LC060762)and discovered the voluntary
dismissal by Davis, When Bennett discovered the dismissal,  he would say, "that's
malpractice" a legal malpractice lawsuit against Davis  was never filed.. After
reviewing the NASD file B&F started filing discovery motions to get documents
on the Estate. On May 30, 2012 in the Superior court case #BC 394851 the court
would inform Plaintiff that since the NASD lawsuit was only about Plaintiff's
personal account, Plaintiff was not entitled to any documents that concerned the
Baker Family Trust(BFT) or Baker Family Partnership(BFP).  Plaintiff was
charged approximately $150,000.00 by B&F.  During the summer of 2005, B&F
substituted in from Hahn upon behalf of Plaintiff as an executor in the Probate for
the Estate. Plaintiff now asserts that B&F who already under  two investigations
within the State Bar also made a deal with the AUSA and/or FBI to squeeze funds
out of Plaintiff, which they did, knowing that they would eventually have to step
aside as they did and today, although Bennett is long since dead, Fairshter who
should have been disbarred is an "active member" of the bar?

     66.    Also during this time, Plaintiff retained the services of forensic
accountant Jim Gill on the advice of B&F and was charged approximately
$150,000.00.  Approximately 85% of the fees charged by Gill were the result of
forensic accounting services pertaining to the 1999 Will, Baker Family Trust

accounts and Baker Family Partnership accounts, which were not part of the NASD arbitration.  Plaintiff's question whether Gill, who recommended Plaintiff gong to the FBI back in 2007 was already working/cooperating with FBI or AUSA.

### Glickman Involvement

67.     On or about August 2006 Plaintiff was recommended   Glickman as a possible legal malpractice attorney  .Glickman was very well known in the legal community as a former president of the Consumer Attorneys Association of Southern California as his father before him.  Plaintiff set up an appointment to meet with him.  At the meeting Plaintiff explained to him that he needed both a legal malpractice attorney and also an appellate lawyer.  Glickman referred Plaintiff to appellate attorney Delores Yarnall. Glickman in late 2006 advised and compelled Plaintiff to go In Pro Se in the Probate Case as it was no longer necessary to have an attorney representing on behalf of the Estate for two reasons. First, the legal malpractice lawsuit, if it became necessary, would be on behalf of the Estate and second, if we needed to get documents, the legal malpractice law suit would be the appropriate vehicle.  It was on May 30, 2012  the superior court in Case #BC394851  Judge Susan Bryant-Deason informed Plaintiff  that the legal malpractice action was solely about the personal account of Plaintiff at AEFA and therefore, all documents pertaining to the BFT and BFP were irrelevant, and third only members of the bar could bring lawsuits on behalf of the Estate. Plaintiff had been advised by letter and email from B&F and Dykema counsel in February 2012,  that only members of the bar could represent Estates.  All three facts, first, that the legal malpractice lawsuit was solely about Plaintiff's personal account at AEFA, the issue of obtaining documents  from AEFA/Ameriprise  through the legal malpractice  lawsuit , and third,  Plaintiff could recover damages of behalf of the Estate were inconsistent to what Glickman had advised Plaintiff on when Plaintiff was compelled to go In Pro Se in 2006.

68.     Plaintiff, on information and belief, alleges that Glickman entered into an  agreement with Phan and R&P to deceive Plaintiff into believing that Glickman would be the legal malpractice attorney if the Appeal was lost, knowing all along the legal significance of the NASD ruling that he learned from Evans in September, 2006.

69.     In August, 2006, Yarnall called Plaintiff up to inform Plaintiff  that she had received a bizarre phone call from Ameriprise counsel Lowery insinuating that Plaintiff had no case, that Plaintiff was crazy and  Yarnall would be sued for filing a frivolous appeal.  When Yarnall did not return Plaintiff's call concerning one of the appeals, that Yarnall was cooperating with the AUSA and FBI, probably from the beginning.   Glickman stated he would contact attorney Phan of R&P. Glickman would receive a binder of some materials from R&P and stated to Plaintiff that Glickman contacted a securities arbitration expert Jonathan Evans With the information that Plaintiff was informed by the honorable Susan  Bryant-Deason,  Plaintiff now alleges, on information and belief, that an agreement was made between Glickman and Phan in that Glickman would not sue R&P or the individual attorneys at the firm, keep quiet abut the tolling of the Statute of Limitations of the NASD ruling. . Evans wanted $5000.00 to draft an opinion letter concerning a possible legal malpractice case.  When the remittitur from the Court of Appeals came down in February, 2008,  Glickman demanded from Plaintiff $5000.00 for the expert, otherwise Glickman would not file the legal malpractice lawsuit. One of the reasons for Plaintiff seeking attorney Byam to terminate the Robert Trust at CNB was to obtain the $5000 for Glickman to file the legal malpractice lawsuit.

## Federal Bureau of Investigation Involvement

70.     In September 2007, Plaintiff had a discussion with Riverside lead Elder Abuse District Attorney Tristan Sware at the California District Attorneys annual Elder Abuse conference in Orange County regarding some legal documents

Plaintiff showed him. Sware responded saying that because of the national nature of the documents take them to the federal authorities. Plaintiff did take the documents to the West Los Angeles office of the FBI. Plaintiff dropped the documents off and discussed it with the FBI agent on duty. A few days went by and Plaintiff received a phone from special agent Steven GOLDMAN. After a discussion on the phone, Special agent asked Jane Baker, my wife, and Plaintiff for a meeting. At the meeting which lasted almost two hours. GOLDMAN became very interested in Plaintiff's legal situation. In all likelihood GOLDMAN already knew there was an investigation by the AUSA office already underway and GOLDMAN and being the head of the white collar crime unit , was head of the investigation; the question is why FBI special agent Goldman lied to Plaintiff; now Plaintiff realizes GOLDMAN was just following orders, in all probability from the AUSA. FBI Goldman said the FBI knew the State Bar was corrupt and that Plaintiff's legal situation would help the FBI prove it. In hindsight, what areas of the state bar are corrupt? The attorney investigation area, the bar examination area; grading the papers, etc. During the tenure of the litigation, Plaintiff had problems with the integrity of the judiciary, There is documented proof that the AUSA office was somehow involved with Plaintiff's federal case in 2009(2:09-cv-3179-GHW(FM0x)). GOLDMAN stated that he would find out were the attorney complaint that Plaintiff had filed against Bennett & Fairshter was in the process. He also requested that Plaintiff send all old and new attorney complaints and any and all documents pertaining to Plaintiff's legal situation to him. He gave Plaintiff his FBI card with the fax number written in. A few days later Plaintiff received a letter from the State Bar requesting that they wanted Plaintiff to come in for an interview to discuss the complaint Plaintiff had filed against attorneys B&F law firm. Plaintiff made the appointment to see investigator Michael O. Chavez. When Plaintiff entered the little interview room, Chavez informed Plaintiff that he had just talked to Bennett who had told Chavez

that Bennett had represented Plaintiff for only a few months.  Plaintiff informed
Chavez that was not the case. We discussed the case for over a period of two days
and almost 4 hours.   At the end of the entire interview, Chavez informed Plaintiff
that if they found that any attorneys committed criminal activities it would then be
referred to the District Attorneys office.  Exactly one year to the day of filing the
original complaint Plaintiff received the letter saying that Chavez had found no
problem with B&F actions as GOLDMAN informed Plaintiff.  As requested by
Special Agent GOLDMAN, Plaintiff forwarded the letter to the FBI.  Plaintiff has
continued honoring the request until a few years ago and has forwarded all
documents including all attorney complaints.

### State Bar Press Release

71.     On October 2, 2016 the State Bar of California issued a press release
specifically addressing the need for reform of "core systematic problems",
especially dealing with attorney misconduct and the investigative process. Part of
the relief sought in plaintiff "Prayer for Relief" is to order the FBI to send the
attorneys complaints to the State Bar Investigative unit using these new
investigative procedures against the defendant attorneys for their misconduct.


72.     Plaintiff, on information and belief, alleges that the STATEBAR of
California entered into an agreement with Dykema, who represented American
Express to look the other way and find Fairshter not guilty of criminal activity
which was directly opposite the findings in a Federal court Sanction Order against
Fairshter. This is part of the attorney complaint filed with the STATEBAR by
plaintiff in 2007 and the formed letter received by plaintiff in 2008 and forwarded
to FBI pursuant to their request.

### Ameriprise contact with Plaintiff in 2008

73.     After the legal malpractice case against B&F and Dykema Gossett had
been filed in   Superior Court on July 28, 2008, on August 18, 2007, Plaintiff

received a phone call from AEFA/Ameriprise agent Timothy Swanson ("Swanson") who stated that, "as a trustee", Plaintiff would want to know about their findings. A letter followed a few days later, stating that in 2007, AEFA/Ameriprise had performed an in house accounting for the taxable year of 2000, which showed that AEFA had overstated income to the IRS and the State of California, and that Plaintiff was entitled to a payment from Ameriprise to compensate for the personal income tax Plaintiff would have overpaid. The letter also stated that a check was enclosed, but there was no check inside. Plaintiff met with Jim Gill, who advised Plaintiff to advise Glickman to send out a subpoena for the accounting. Glickman stated to Plaintiff that in time he would. Glickman did not send a subpoena. Glickman had also advised Plaintiff as did all subsequent attorneys Stern, Langer and Mahavier that in legal malpractice cases there is no recovery for punitive damages in the underlying case.

74.    Plaintiff sent a letter to Swanson asking for documentation for the in-house accounting and telling Swanson that there was no check enclosed in Swanson letter. Swanson wrote back refusing to provide any documentation, and gave Plaintiff instructions on how to obtain money due Plaintiff. There was no deadline set by Ameriprise for Plaintiff to claim his money. Plaintiff followed SWANSON instructions to obtain Plaintiff's money, but received no response. Plaintiff left a voice message for Swanson, but he did not respond. Plaintiff then called the phone number for service that Swanson had included in the instructions. Plaintiff's call was directed to an agent who told Plaintiff he was an associate of Swanson's. This agent could not find any reason for delay and instructed Plaintiff to fax the request again to Swanson, to be sure it had been received. Several days later, Plaintiff received a letter from Ameriprise counsel demanding that he "cease and desist" any contact with Ameriprise, and telling Plaintiff that they had no information for him. Plaintiff has never received the money Ameriprise stated

that they owed him. In all likelihood the 2007 accounting described above was part of intrusion by AUSA.

75.     In August of 2008, Plaintiff advised Glickman that the FBI had taken an interest in the legal situation. In all likelihood, Glickman was already cooperating with the AUSA office.

### Stern's Involvement

76.     Plaintiff was referred to attorney Stern to handle another legal malpractice lawsuit against Hahn(BC408161). The deposition of Byam proved fruitful.  In material areas Byam made false statements concerning material issues. First, Byam stated that his partner at Hahn, William Garr, after a review of the documents did not want to represent Plaintiff in a lawsuit against AEFA.  In fact Plaintiff has documents from Garr from 2001 which states that indeed, Hahn did want to represent Plaintiff. During the legal malpractice lawsuit the issues of CHO an associate at Hahn and her involvement with her dealings with  CNB became a central issue especially whether Cho was determined by the court to be  a necessary party and the trial had to be delayed for her testimony at trail although no deposition was ever considered by Stern to be necessary. Plaintiff learned on May 30, 2012, that Hahn might have received documents from Ameriprise pertaining to the BFT, BFP which Byam neither disclosed and/or gave copies to Plaintiff during 2001-2004. Due to Stern's making false statements to the court in his Motion to Withdraw as Plaintiff counsel a mere three weeks prior co trial and that the court stated to Plaintiff that "you have to pay your lawyer" was the reason she allowed him to withdraw. Plaintiff, after the false statements were made by Byam, sought to get more documents which were never produced.   In the original consultation and a few subsequent meetings, Plaintiff gave Stern a very detailed history of the entire legal situation.  Within days, Stern advised Plaintiff that he thought there were at least two very solid lawsuits. It is obvious at the present time that Stern, was working with the AUSA office who was orchestrating

his every move, force Plaintiff to go In Pro Se, as was done elsewhere in case
BC394851, to get the court in BC408161 to dismiss the case with prejudice; the
case was eventually sealed by Hahn's lawyer, David Long to cover up
unprofessional conduct and fraudulent conduct by Hahn, LLP lawyers.  With the
recent enactment of Professional Conduct Rules(Rules) made effect November 1,
2018, the state bar can now open up an investigation without a prior civil
judgment against the lawyer.  Although this change in Rules is substantial does
the ends justify the means of achieving the Rule, Plaintiff asserts that destroying
Plaintiff's and the Estate of Kate Baker's due process rights while at the same
time protecting Ameriprise Financial, Inc., and its various agents as well as  Allen
R. Baker, Frank A Baker due process rights, went way beyond reasonable
justification.

    77.    Plaintiff alleges that Stern entered into agreement with Glickman to
deceive Plaintiff into thinking that Stern was interested to combine the then non-
existing Ameriprise State Case with the legal malpractice case on
appeal(BC394851) and then claim for financial reasons he had to get out.

    78.    In   2009 Stern filed a Federal Lawsuit (2:09cv-09-3179(GHW(FMOx)
on behalf of Plaintiff primarily against Ameriprise Financial, Inc. and several law
firms. The lawsuit was founded of R.I.C.O.  Initially when Plaintiff consulted with
Stern Plaintiff informed that Plaintiff had received the letter from Ameriprise
concerning the check for the refund from Ameriprise as a result of the tax audit in
December 2007 for the year of 2000. This fact was prominent in the filing of the
federal lawsuit.  The parties knew that Plaintiff was dependent upon the monies he
got from his mother and from the 2002 Settlement Agreement and all of the trickle
down monies he got along the way.   Stern would refer plaintiff to attorney Levin
who was paid a consultation fee for elder abuse expertise and consultation with
law firm Hahn.

79.     Glickman needed the $5000 by July 31, otherwise the tolling agreement that the defendants, Dykema and B&F had signed would end.  Plaintiff was forced to settle with Allen and Frank regarding the Robert Trust that had been set up at CNB and give them a huge percentage that they would not entitled to. .

### Ameriprise counsel threatening forensic accountant Jim Gill

80.     On July 19, 2010 Defendant AEFA/Ameriprise Counsel Lowery when Ameriprise was a defendant in the Amerprise State Case made a threatening phone call to the forensic Accountant Jim Gill. The Declaration was never filed with the court in case BC435030 by Stern. The question which the Plaintiff's poses now is, was this call precipitated by either the AUSA and/or the FBI.

### Stern's Involvement continues

81.     During Stern's representation of Plaintiff's lawsuits, we often would discuss the legal malpractice Bennett Case that was on Appeal. Plaintiff now believes, Stern wanted the case because the AUSA instructed him to.  Although it was Glickman's Case and would be Glickman Case if Plaintiff won the Appeal, Stern made statements that he would like to combine the Ameriprise State Case with the Appeal case.  Stern had the Ameriprise   State case on a 20% contingency except for the non-refundable $5000.00.  After the filing of the Ameriprise State Case, Plaintiff paid Stern monies to effect proper service on the various parties for depositors.  The service was for a deposition to take place for Cohen which never happened prior to the demurring out of the Ameriprise Case.  This same happened in the Bennett legal malpractice case with regard to Cohen again in December, 2011 when Mahavier attempted service of process for a Cohen deposition. In August, 2005, the NASD ordered an immediate deposition of Cohen, it never took place.

82.     Stern sued Byam of Hahn LLP for legal malpractice in2009 (BC435030).  During one of the 4 depositions that Plaintiff was taking, Plaintiff was asked(very quietly) by Stern if Plaintiff had updated the FBI as Plaintiff had

informed Stern in a prior meeting. Obviously Stern was already cooperating with the AUSA since his office was involved with the federal lawsuit where AUSA is listed.

83.    In late  2010 Plaintiff would contact Evans for the opinion letter and Evans would inform Plaintiff that Glickman sent him a fax in September 2006 with a copy of the NASD ruling and the fax stated to:  Review and call him. Plaintiff learned from Evans in 2010 that Evans did not draft an opinion letter and never received the $5000.00 from Glickman.  Within days of Plaintiff learning this fact, Plaintiff received a check for $5000 from Glickman.  The NASD ruling was based on Code Section 10305, which had two parts: 1) The lawsuit had to be refiled in superior or federal court 2) The statute of limitations was tolled since the NASD complaint was filed.  Plaintiff's NASD complaint was filed in 2002.  This new information would have significant impact of the issue of Statute of Limitations.

84.    During the later part of 2010, Stern stated for financial reasons he needed to get out of all cases.  Plaintiff learnt that attorneys(who are officers of the court)  need to get permission from the court to withdraw from a case... At first he stated he needed to get out; then he demanded to get out and eventually threatened Plaintiff and attempted to extort monies from Plaintiff. Because of the threats, Plaintiff was forced to go In Pro Se on the Ameriprise State Case.  During the last months of 2010 Plaintiff started to look around for other lawyers to take over the cases because Glickman had been the original attorney.

### Marh and Langer's Involvement

85.    Plaintiff had been referred to attorney Marh.   After a couple of meetings Plaintiff signed the retainer agreement which provided for a non-refundable $3500.00 and 20%-34% of any settlement or judgment amount. The agreement included two cases: Case #BC394851 and Case #BC435030. Marh then advised Plaintiff that attorney Langer would be the person doing the

discovery work.  Langer had been the attorney who had referred Plaintiff to Marh
Plaintiff meet with Langer and advised Plaintiff that he would immediately
respond to the opposition discovery and then at the same time would  begin
serving discovery items on the opposition and AEFA/Ameriprise.  First order of
business was  to draft the 4th amended complaint. While Langer was preparing the
4th amended complaint, Plaintiff received an email, detailing the fact that Langer
could not understand why attorney Fairshter had not be named as a defendant
originally by Glickman and why the estate had not be named as a Plaintiff also by
Glickman.   Langer added both to the 4th amended complaint.  Also, Langer
removed the Elder abuse damage provision saying it didn't have to be in the
complaint since the elder abuse was against the underlying case of Ameriprise.
This substantially affected the demand for damages that Mahavier.

86.     In 2011, Judge Susan Bryant-Deason ordered that a mediation should
take place between the parties.  The mediation did take place in Century City
where at the mediation mediator Robert Altman(Ret. Judge) was the mediator.
Defendants were presented by  counsel. Plaintiff in this case and Plaintiff in that
legal malpractice case was represented by Simon Langer.  Also, mediator Altman
seemingly got frustrated that Plaintiff would take a meniscal amount of damages
and left the mediation but not before leaving his sport coat on the seat. Plaintiff
happened been  informed that immediately following the mediation David Marh
and Simon Langer would request to the court to withdraw which they did and
Plaintiff was forced to seek, in a most expeditionary way other legal counsel.. All
parties including the mediator represented the worst of what the due process of
law is about.  This mediation is similar to the mediation that took place in 2001
pursuant to the Probate court Order in that, the mediator Martha Goldin(Re.
Judge) was part of the scam also before the AUSA became involved but whose
acts demonstrate that they orchestrated to make sure of the continuation of the
cover up. The AUSA knew of the loathsome conduct of Ameriprise Financial, Inc,

the bribery by various parties, including Allen R. Baker to achieve the ends of formulating new rules for the State Bar to follow. In essence again, does the end justify the means: Plaintiff would argue NO.

87.     Soon thereafter, Langer informed Plaintiff by email that defendants were moving to strike Fairshter as a named defendant. On May 30, 2012, Plaintiff would learn that defendants had actually moved to strike out not only Fairshter but also the estate from the complaint and were successful  Marh knew that Plaintiff was frightened to go In Pro Se since Plaintiff was not a member of the bar and was unble to do competent discovery.  Soon after Langer had produced the documents which were the result of Jane Baker's efforts, Marh started to attempt to extort monies from Plaintiff.  Marh  attempted extortion would scare Plaintiff to find another lawyer which would be extremely difficult because of the deception by various parties.

88.     At the time of the attempted extortion Plaintiff started to interview attorneys to take over the case.  By this time, the Ameriprise State Case(BC 435030) had been demurred out, as the result of  actions of Stern, Marh, Langer, and  Ameriprise.

### Steven Lewis Goldblatt's involvement

89.     In late May, 2011 in the process of interviewing attorneys, Plaintiff discussed the case with securities arbitration/legal malpractice expert Steven Lewis Goldblatt from St. Louis, Mo.   Goldblatt informed Plaintiff  of the significance of the NASD ruling code § 10305. Goldblatt explained the § 10305 has two parts:  1) counsel must re-file in Superior Court or Federal Court, 2) The Statute of Limitations is tolled as of when the case was first filed in the NASD, in Plaintiffs case since 2002.   Goldblatt at that the time wanted to be retained either as counsel or as an expert.

### Philip Aidikoff's law firm experience

90.     In 2001, William Garr of Hahn who wanted the case for a U.S. District filing  although plaintiff was convinced by attorney William F. Davis that the case was going to be compelled to arbitration to be filed in the NASD(now  FINRA), referred plaintiff to attorney Philip Aidikoff of Aidikoff & Uhl, LLP(Aidikoff). Aidikoff was the founder of PIABA(Public Investors Arbitration Bar Association). A on my behalf, sent a request for documents for the Robert Baker Trust  to AEFA. When there was no reply, he sent another request to AEFA. Within a couple of months, Aidikoff' s  law offices received the documents. Had Aidikoff sent in the request for both RBT and the Trust documents for the Baker Family Trust and received such documents, then the documents would be given to the accountant for damage calculation, the legal controversy would have ended.

91.     Aidikoff knew Cutrow thought the Jewish Federation and did not request documents for the Estate of Kate Baker. Aidikoff said he wanted the case but he used the excuse that plaintiff was a little shaky and suggested plaintiff go elsewhere for representation. That December 2001 Byam who was representing Plaintiff in a probate matter in opposition to Allen  and Frank, did in fact represent plaintiff in a deposition. Byam years later would refer plaintiff to attorney Stanton who was paid a fee for false advice.

92. When in 2010, plaintiff was compelled to seek representation when attorney Stern demanded to withdraw from all cases in which he was representing plaintiff, plaintiff got a referral to consult Sepassi & Tarighi, LLP in Encino, CA. Plaintiff meet with them and they insisted on contacting Aidikoff which plaintiff agreed to.  Within a few weeks, plaintiff received a letter from the law firm and, in so many words, they did not have the time for the case regardless of its value. Plaintiff then was referred to attorney Joseph Tuckmayer who wanted to bring in attorney Mark Adams of Stockton, Ca from in as co-counsel but first they wanted plaintiff to get a damage calculation from James Gill, CPA. Plaintiff would hear from Tuchmayer that, despite the level

of damages the fact that the FBI had opened by an investigation made them very nervous.  Plaintiff would learn on February 27, 2017 that the AUSA was involved in an earlier federal case as discussed elsewhere in this complaint.

93. In 2011 plaintiff secured the representation of two attorneys from San Diego:  Mahavier and Harris. They stated they needed a securities expert for expert testimony. Although plaintiff did explain the history with Aidikoff, Mahavier and Harris saw no problem. After a consult between Aidikoff, Mahavier and Harris, Mahavier stated that Aidikoff wanted plaintiff to put together all the relevant documents and send them to Harris who would forward them to Aidikoff.  Jane Baker, Plaintiff's wife, spent countless hours putting the documents together with an extensive cover sheet purpose of which was to put everything in context. The documents were delivered to Harris to be forwarded to Aidikoff. After Mahavier had promised to file a Motion for Reconsideration but never did, Plaintiff was forced to go In Pro Se even after paying Harris and Mahavier each $7500.

**Superior Court Judge Orders Mediation in 2011**

94.      The honorable Superior Court Judge Susan Bryant-Deason ordered mediation in early 2011 to occur prior to a hearing in June, 2011.   As of the May 30, 2012 hearing when Plaintiff learned that the legal malpractice lawsuit was solely about the Plaintiff Trust account. it was abundantly clear how contrived , deceitful,  and abusive  the mediation was.. It reminded Plaintiff of his first mediation back in 2001 which was also based in fraud now that Plaintiff knows that his own counsel Byam had deceived Plaintiff in material ways in order to obtain the 2002 Settlement Agreement since Plaintiff had chosen Davis to represent Plaintiff in any further action against AEFA/Ameriprise. . In the deposition Plaintiff took back in 2001 which was an abusiveness deposition and should not have taken place had Byam not deceived Plaintiff and allowed Karl de Costa (MSK)who deposed Plaintiff to go into the personal history of Plaintiff

which was irrelevant but only allowed to try to have Plaintiff collapse and give up, which at the mediation Plaintiff did collapse and give up..

95.     Robert Altman(Ret. Judge) was the mediator in 2011.  Mediator boasted of beings friends and colleagues of the CA. Court of Appeals Judges.   Instead of being about the facts of the case, it was about the personal history of Plaintiff and why the FBI took an interest in the legal situation.  Plaintiff did not collapse like Plaintiff did in 2001 and did not accept the $80,000 Plaintiff was being harassed to take as an offer. That mediation was about only the RBT as informed to Plaintiff by the honorable Susan Bryant –Deason, whereas, this Complaint and the legal case in 2:16-cv-08434-GHW(FMo) is about all the Baker Family Trust, Baker Partnership and the RBT.   The mediation lasted a very short time, and the mediator was embarrassed to have been called when parties were not ready to settle, and he left in such a hurry that he had to return for his coat. It is eight years later and such behavior by Plaintiff's counsel Marh and Langer, the mediator Altman  and possibly the AUSA/FBI should not be tolerated by this Court.

96.     Plaintiff was under extreme pressure to find a new law firm to substitute in by the hearing set for late June, 2011 where Marh 0would withdraw. Plaintiff's  lawyers, Marh. and Langer. as well as all previous attorneys including all defense counsel were aware that Plaintiff was frightened to go In Pro Se.

97.     Plaintiff, on information and belief, alleges that Langer and Marh entered into an agreement with Glickman,  Dykema and B&F counsel to deceive Plaintiff into thinking that the Estate was part of the legal malpractice lawsuit, and that the Dykema and B&F were entitled to document production concerning the Baker Family accounts, that the legal malpractice case was for damages  of both the personal account of Plaintiff and the family accounts.

## Mahavier and Harris involvement

98.     Plaintiff starting interviewing counsel any where in California.  Second, Plaintiff needed to find local counsel if Goldblatt was coming in on the case.

Plaintiff found attorney Harris located in San Diego, CA.  After a few emails where Plaintiff produced all the documents requested by Harris, Plaintiff drove down and meet with Harris.   At the meeting Harris informed Plaintiff that because of the size of the case, he needed co-counsel and recommended Mahavier.

99.      Plaintiff thereafter went to San Diego again and met with Mahavier and Harris.  Plaintiff made it very clear that what Plaintiff needed was discovery to be done.  Mahavier could not understand why discovery had not been done. The condition that they made on the case was that they needed a continuance of the trial in order to do discovery until a few months into 2012.  By June 22, 2011 Plaintiff and Mahavier and Harris had entered into two separate retainer agreements with the condition of a continuance of the trial.  When the continuance was granted, the retainer agreement became active which called for each Mahavier and Harris to receive non-refundable check for $7500  each and 10% each for any recovery via a settlement or judgment.  Plaintiff sent one check for $7500 to Mahavier and one check for $7,500 to Harris in the US mail.

100.     At the withdrawal hearing, both Langer and Marh were granted their withdrawals and the court graciously granted Plaintiff a continuance.  Then in October 2011, at the Motion for Sanctions hearing where Mahavier drove up to Los Angeles to be present, the opposition were granted sanctions against Plaintiff personally for $3500 and the court stated on record that the verification form of Plaintiff's signature had not been filed along with the summary of accounts, without which the over 160 pages of accounting detail made little sense.  This accounting, which Mahavier knew was being done by Jane Baker, under the supervision of Jim Gill who was on vacation or on other pressing engagements. Jane Baker worked around the clock for 2 months to draft and finalize the accounting.

101.    In October, 2011  Mahavier  wanted a securities arbitration specialist to consult with.  He mentioned in an email about the Midwest guy so Plaintiff

emailed to see if Goldblatt was still available and received an email back  Plaintiff thereupon emailed Aidikoff as a perspective expert.  Soon thereafter Mahavier and Harris  supposedly consulted Aidikoff who requested ASAP a decaled summary with documents.  Both of these lawyers are experts in their respective fields. Also, Mahavier deceived Plaintiff into thinking that the Estate was still part of the lawsuit and therefore a significant part of the summary that Aidikoff received was irrelevant. Jane Baker would have had only to work on the summary of the Plaintiff's  account for two days instead of 2 weeks

102.   Plaintiff, on information and belief, alleges that Mahavier and Harris entered into agreement with Ameriprise to deceive Plaintiff into believing that their was going to be a deposition of  Cohen and second, that Plaintiff, in the legal malpractice case(BC394851) was entitled to documents pertaining to the Baker Family Accounts.

103.    On December 23, 2011 Plaintiff meet with Mahavier and Harris in Mahavier's office in San Diego for a status conference. Mahavier informed Plaintiff that he would file an objection to the Motion for Judgment on the Pleadings.  We spent 3 hours discussing some possible new parties and new causes of action for an 5th  amended complaint he would file attached to the Objection to Motion for Judgment on the Pleadings. Plaintiff, in hindsight, remembers another significant issue that came up at this meeting; Plaintiff asked if Mahavier was going to file a Motion for Reconsideration Sect. 1008(b). Mahavier answered that it was interesting that Plaintiff knew about that CCP code section. In retrospect that was the moment that informed Plaintiff that Mahavier was probably being "controlled" by the AUSA.  Mahavier asked   Jane and Plaintiff to think about it and send us certain documents that we discussed in the 3 hour meeting.. At the meeting, Mahavier and Harris promised to serve Stanley R. Cohen, stockbroker a subpoena for a deposition.   The subpoena for deposition went out December 27, 2011. Another promise was to serve a subpoena for the

production of documents on Ameriprise.   Harris did serve the Subpoena on Ameriprise.   Over the weekend, we worked around the clock to send Mahavier and Harris documents and summaries on Monday December 26, 2011.

104.   On January 12, 2012, Plaintiff attended the Judgment on the Pleadings hearing.   Plaintiff would learn during the hearing that not only did Mahavier never file an Objection as promised, and an amended complaint, he did not show up either by phone or in person.   Plaintiff immediately, sent an email asking what happened.   Mahavier never replied. In hindsight and knowing that the AUSA office can be very intimidating, Mahavier representation of Plaintiff had been interfered with. Plaintiff sometime after that hearing contacted Mahavier and Harris to file to have a mediation with the State Bar regarding Plaintiff to get back the monies paid to Mahavier and Harris($7500 each) since their representation from the beginning had be bogus.   Mahavier and Harris are still an "active" members of the bar.

### Plaintiff is forced to go In Pro Se

105.   On January 17, 2012, Harris sent Plaintiff by email a copy of Ameriprise Subpoena Objection which was dated one day after the January 12, 2012 hearing for the Judgment on the Pleadings which had been granted.  Plaintiff decided to go In Pro Se to file a Motion for Reconsideration which had to be filed by January 30, 2012.  Plaintiff who had never filed a Motion for Reconsideration along with Jane, worked, again, around the clock to meet the January 30, 2012 deadline.   Plaintiff used this new information, at least Plaintiff thought it was new, as the basis for CCP 1108(a).  It was filed on time.

106.   Thereafter, Plaintiff sought to do discovery in both the legal malpractice case and using the still active probate case. When Plaintiff send out subpoenas on the legal malpractice case, the defendants DYKEMA and B&F(2:16-cv-08434-GHW(FMo) counsel opposed stating in emails and a letter that the legal malpractice case was technically dismissed and therefore, no discovery was

permissible. Since Plaintiff is not a member of the bar and did not know, Jane

Baker had to work again to withdraw all subpoenas served.  According to

California law only members of the bar can sue on behalf of an Estate which is

deemed a separate entity, such as a corporation, partnerships, and trusts.

107.   In March 2012, Plaintiff, acting in his capacity as an executor

subpoenaed the Estate file of his late mother from MSK who were the firm the

represented the Estate of Kate Baker.  The response was an Objection stating

among others objections was that Plaintiff did not have standing.   This was

curious to say the least, since the Letters of Testamentary that gave Plaintiff his

executorship, was drafted and filed by no other than Cutrow as senior partner at

MSK.

108.    Plaintiff sought to do  further discovery using the letters of testamentary

and was able to track down the company who had purchased  AETBS  After

many phone calls, Plaintiff located where the records were and sent a request

accompanied by a copy of the letters of testamentary. AETBS also did the

accounting for the RBT in 2001 under Dematoff and sent a bill for around

$30,000; everyone agreed it was an outrageous fee. The company,   McGladrey

CPA's produced an entire box of tax returns dating back to 1995-2005 with back

up. Although McGladrey CPA's produced an entire box of tax returns. These

same documents were seen by attorney Clark R. Byam of Hahn during the year of

2001 but as stated elsewhere in this complaint, took some sort of bribe from Allen

R. Baker and looked the other way.  Plaintiff recalls in 2001 in discussing the

legal situation with Byam, Byam informed Plaintiff that Allen R. Baker had

informed Byam he had no money so Byam counseled Plaintiff to settle with his

two brothers in the Probate Court which resulted in the Settlement Agreement of

2002, instead of naming Allen R. Baker and Frank A. Baker as defendants in a

civil lawsuit.  Plaintiff received from Allen an Assignment of Claims and

Indemnity Agreement(Agreement) March, 2013), five pages in length, which had

been drawn up by Cutrow. After careful consideration and meetings with both Allen and Frank Plaintiff did NOT sign the Agreement. The Release was basically excusing Allen and Frank of liability for $5million dollars each for their tortious conduct to the Baker Family accounts and so-called entitling Plaintiff to view the Estate file at MSK and the account files at Ameriprise. Plaintiff was by virtue of being an executor was already entitled to view the Estate file and the account files. Plaintiff did fax a copy of the Agreement in an Update to the FBI right after Plaintiff refused to sign the Agreement. AUSA conduct of interfering with Plaintiff's conduct foreclosed Plaintiff's ability to have legal counsel review the Agreement.

109.    During the forensic accounting in 2005 Gill found several unknown withdrawals with only account numbers but no other identifications. A cursory review established that one of the withdrawals which was accomplished by forgeries had been wired to Allen Baker's Family Trust. Also during March 2012, plaintiff sent probate subpoenas to MSK for documents regarding the Estate file of Estate Baker only to receive same documents plaintiff had received in the past. The documents were the same as before but now received from MSK's general counsel Leonard. Jane Baker attempted to serve a probate subpoena on MSK and was confronted by Leonard who greatly intimidated Jane Baker by words and actions.

110.    The review of the documents also produced by McGladrey CPA's contained a copy of 2005 tax return which showed that an account from Bear Stearns still existed until 2005. The fact was that all monies from Bear Stearns were supposed to be transferred from Bears Stearns to AEFA in early 1996, but this suggests that was apparently not the case. Plaintiff contacted Mark Gordon, a broker for the former Bear Stearns, now part of JP Morgan, Inc., and asked Plaintiff to fax and he would check into it. The fax was sent in April 2012 and on July 16, 2012 Plaintiff followed up with Mark Gordon to find out he did nothing

when he received the fax.  Gordon  contacted Plaintiff and said he was still doing research in 2012.

111.   During March 2012 Plaintiff served several probate subpoenas on various people and entities for production of documents and for depositions. Allen and Frank in their capacities as executors filed various objections with the court and with the then opposition defendants and Ameriprise counsel, Elizabeth Lowery.

112.    At the hearing of March 22, 2012,  the court denied Plaintiff's motion for Reconsideration.  During the short hearing, defendants again claimed that the NASD ruled that Plaintiff had no standing and the court stated it did not want to relitigate the matter.

113.    Hearing the deceitful arguments made by the defendants' Dykema and B&F, Baker filed a renewal of the motion for Reconsideration as allowed by CCP § 1008(b) in the accordance with the provision.

### New Evidence pertaining to the Baker Family Accounts

114.   With the new evidence pertaining to Allen  acts between approximately 1996 with the assistance of lawyers, Ameriprise entities, Plaintiff used the CCP 1008(B) to obtain a reversal of the previous motion. This time, Plaintiff was indeed stunned to find that that Langer who had added the Estate to the 4th amended complaint and informed Plaintiff that only Fairshter had been stricken deceitfully left out that the Estate had also been stricken.  Furthermore, when Mahavier and Harris sought discovery for documents and deposition, is was to deceive Plaintiff.  Baker also wanted to have the court put back on calendar the Motion to Overrule Objections and Compel the Production of documents that had been filed by Baker.  Plaintiff and Jane Baker worked around the clock to put together the motion after having never done this type of motion before.

115.   Plaintiff's wife Jane prepared a very detailed summary of the acts of B&F, Dykema, and R&P for the Renewal of the Motion for Reconsideration heard on May 30, 2012.

116.   In May, 2012, the hearing for the Motion for Reconsideration was held in the court room of Judge Susan Bryant-Deason which lasted almost 2 hours. The basis of the hearing was for the court to recite the history of the legal situation and to supposedly help Plaintiff to get an understanding of the direction the court and therefore the AUSA wanted the legal direction to proceed.  Attorney Joel Boxer was subpoenaed to appear instead of their usual counsel.  Attorney Boxer brought with him a clerk who was presented to the court. According to the Ameriprise subpoena objection they had produced documents to the "plaintiff in a prior probate proceeding". Judge Susan Bryant-Deason strongly implied that it was possible that the documents were produced as far back as 2001. As Plaintiff's thinking has improved(per the late Bion theory of thinking) of having the capacity of putting the facts together,  from the initial Probate hearings in 2001, to the filing of LC060762 was to do away with the due process rights of Plaintiff and the Estate of Kate Baker and give time to the AUSA to clean up the corruption in the State Bar, NASD, judiciary.

117.   . Plaintiff can see that attorneys Mahavier and Harris were working together with Ameriprise counsel again under the orchestration of AUSA office to provide Judge Susan Bryant-Deason the opportunity to direct the Plaintiff in a certain direction, the Probate court.  Plaintiff realizes, now, that in order to hide any of the documents that are at the law firm at MSK that pertain to the  Estate for the Late Kate Baker the AUSA needed to make sure that all claims were individual and not trust claims which needed a lawyer under State Bar rules to represent the trust claims.

## Probate Order of November 18, 2013: Individual accounts/claims

118.   Plaintiff in his capacity as an executor filed a petition in a probate court case against a probate court case to get monies that had been unlawfully distributed to Allen and Frank based on an internal audit by Ameriprise entities in December, 2007. The probate court issued an order on November 18, 2013 that the Probate court did NOT HAVE JURISDICTION over the accounts at Ameriprise entities but were individual accounts and, therefore, not trust accounts.

119.   In January, 2015 plaintiff filed a Motion in LC 060762 based on the recommendation/suggestion/advice given by the honorable Judge Susan Bryant-Deason years earlier(May, 2012) in the legal malpractice case BC 394851 during a lengthy hearing that lasted almost two hours where plaintiff was In Pro Se.(The transcript of the hearing is part of the appendix in Ca. Court of Appeal Case B265262).  On April 29, 2015 the court issued an order. The court never issued the proper ruling that could be appealed. Following the same legal procedure that attorney Delores A. Yarnall did in 2007, plaintiff first went to the trial judge to obtain the signature of the court to no avail.  Then, as attorney Yarnall had done in 2007, went to the Ca. Court of Appeal to force the trial judge to sign the judgment which Judge Wolfe eventually did.

120.   On June 29, 2015, plaintiff attempted to file a  difficult drafted Request with the California Court of Appeal, Second District, where the Court would order the lower court to comply with the Civil Procedure rule allowing a case to be appealed following in  Yarnall footsteps of 2007. The assistant clerk gave plaintiff's Request to LUPO the supervisor clerk who while reading my Request called someone on the phone, which named FBI special agent GOLDMAN'S several times, and had a lengthy conversation with person or person(s). Thereafter, Lupo came to the counter, talked with Plaintiff and gave Plaintiff a copy of the Petition to Appeal. Lupo then informed Plaintiff to check the box entitled, "Order after Judgment". Lupo then stated that plaintiff would have to get the service of process signed and file it that day to meet the deadline. Plaintiff did file the

Petition to Appeal that day at the Clerk's window at the Van Nuys Superior Courthouse to be timely filed.

121.   Thereafter, Plaintiff filed his opening appellate brief with a lengthy appendix for case B265262. The two ironies are that in the underlying case no depositions, interrogatories or subpoenas for production of documents have ever resulted in their production. The second irony is that plaintiff has had to file In Pro Se since January, 2012 every legal document, including the present federal complaint to protect plaintiff's, and indirectly, Kate Baker's civil rights.

122.   The Court of Appeal for the Second District on its own Motion created a case: B262293. That case was deemed to be filed late. The Court consolidated both cases under B265262.

123.   The Court issued an order dismissing the case in its entirety. Plaintiff then appealed to the California Supreme Court which denied the Petition for Certiorari.

124.   Plaintiff then filed a Petition for Certiorari to the U.S. Supreme Court which was denied on June 3, 2016.

125.   Plaintiff sent defendants except the honorable presiding justice Bowen and associate justice Hoffstadt on June 19, 2016 a letter discussing possible future legal action. The FBI was also sent a curtesy copy of the letter.

126.   Plaintiff in the earnest effort to save this court's time and energy sent a Demand Letter on September 18, 2016 to all defendants except presiding justice Boren, associate justice Hoffstadt and the FBI: although the FBI did receive a copy from plaintiff as plaintiff has updated FBI per FBI initial requests. Plaintiff received on September 24, 2016 a response from senior counsel of CNB, Diane Wemple Baxa. Plaintiff sent Baxa copies of both The Baker Family Trust and a Letter of Testamentary.

127.   On November 18, 2016 Plaintiff filed federal lawsuit 2:16-cv-8434-GHW(FMo). . All the parties were properly served. During the course of drafting

the federal lawsuit 2:16-cv-8434-GHW(FMo) Plaintiff sought advice from the Pro Se Clinic which is funded and put on by the Los Angeles County Bar Association in the federal building which is supposed to be neutral . This was the second time Plaintiff had sought counsel from the Pro Se Clinic, again Plaintiff was advice that their policy was not to provide help if any of the named parties were attorneys. Since a brief review of the front page of the lawsuit any person could see that a number of attorneys are named.

128.   Shortly after service of process to all parties of federal lawsuit 2:16-cv-8434-(GHW)(FMo) Plaintiff received a letter from one named Defendant: CNB. chief counsel, Diane Wemple Baxa sent Plaintiff a letter, in essence, that if Plaintiff made a few corrections to the Complaint CNB would say they received the complaint. Pursuant to the FRCP section that allows one amendment without seeking permission from the court, Plaintiff did, in fact, make the corrections and served every party at great time, expense and energy.  Even after a redrafting of the Complaint CNB never honored their agreement to Plaintiff.

129.   During the month of February 2017, Plaintiff  wanted to retain counsel. What was taking place in the federal lawsuit 2:16-cv-08434-GHW(FMo) was well beyond Plaintiff's experience as stated elsewhere taking depositions, etc.  Plaintiff had realized that informing his attorneys of the FBI opening up the investigation, at least Plaintiff thought the FBI had opened up the investigation in October 15, 2007, was not helpful.  Then Plaintiff decided that when an attorney wants to take over a case he would review the dockets of all cases filed and any discovery had. So Plaintiff started to review the dockets of the cases, Plaintiff looked up federal lawsuit 2:09-cv- 08434-GHW(FMo)  on February 27, 2017  and started to scroll down the docket in a manner similar to that discussed earlier in this complaint of how Plaintiff found a lecture by Isadore Glauber and suddenly was shocked to see that the Defendant law firm of Dykema Gossett, LLP was being represented by Boxer and Benjamin Lichtman from the AUSA.

130.    On May 14, 2017, even though the Court in 2:16-cv-08434-GHW(FMo) had closed the case on July 3, 2017 still held a hearing where it issued an Order dismissing the case and abused its discretion by adding Ameriprise entities which had definitely filed their Motions untimely: Plaintiff has appealed that Order which is Appeal #17-56506. At the hearing the current Plaintiff who was the Plaintiff in that case was quite stressed out being that the Court room is not let us say his comfort area.  The transcript would show that instead of speaking to the Court regarding the issue that the court had no jurisdiction the Plaintiff rambled on concerning his learning disabilities. Plaintiff was at that time rather intimidated in the courtroom.  More importantly, the running of the statute of limitations had been tolled by the fact that when a criminal investigation was opened up probably much earlier than when Plaintiff meet with the FBI on October 15, 2007 and continues to be tolled. Also should the evidence emerge that the AUSA came in much earlier as in 2001 or the NASD Order was issued in compliance with the AUSA then has continues to be tolled.

131.    Plaintiff had already filed appeal #17-55989 and the district court had closed the case on July 3, 2017 when the hearing on was held. Appeal #17-55989 issues were centered around the Statute of Limitations within the first amended complaint(FAC) in 2:16-cv-08434-GHW(FMo).  Under FRCP, the defendants in the FAC must file a Response within a certain number of days after being served with the complaint and other legal papers.  The docket in 2:16 –cv-08434-GHW(FMo)   shows that Ameriprise entities did not file timely response filing on March 20, 2017.

132.    Plaintiff then filed what became appeal #17-56301 is based primarily on that the lower court ordered that Plaintiff must request from the lower district court a certificate to file a lawsuit against Ameriprise entities. In their lower court filings Ameriprise asserted that Plaintiff has filed numerous lawsuits against Ameriprise since 2002 and has lost each time.  Although Ameriprise filings were

untimely in the lower court, Plaintiff in Appeal 17-56301 clearly points out that each time a lawsuit against Ameriprise was filed their was interference first by Ameriprise and then with a colluded effort by Ameriprise and AUSA to specifically interfere with the due process rights of the Plaintiff.  One such example is federal lawsuit 2:09-cv-3179-GHW(FMo) where attorney Stern specifically left out the Estate of Kate Baker which was the proper party to be Plaintiff.  Stern, possibly under pressure from the AUSA office was compelled to only name Plaintiff as an individual owing to the fact that the AUSA office was connected directly to the lawsuit as stated in the docket.

133.   Plaintiff then attempted to file both the Request for Reporters transcript and Service of Process. The clerk of the court refused to file the service of process document even though it was required by the 9th Circuit Court of Appeals. The clerk filed the Notice of Deficiency and the Court ordered the service of process should be rejected and notify the Defendants Ameriprise counsel in case 2:16-cv-08434-GHW(FMo) with precise instructions which Plaintiff followed. This became the 3rd appeal #56506.

134.   Plaintiff in due course drafted and filed the opening and reply briefs for all three appeals:  17-55989;17-56301; 17-56506.  On July 3, 2018, the clerk of the 9th Circuit issued an Order, that among other items, that briefing was complete.

135.   On or about January 30, 2019 Plaintiff received from a fellow colleague who knew of Plaintiff's  research on stuttering an article published November, 2018 to further explain the comments of Dr. James Grotstein stated above, and help explain why the standard of psychoanalytic treatment is not BOR.

New Professional Conduct Rules of State

Bar   Effective November 1, 2018

136.   Plaintiff discovered during the summer of 2018 that the State Bar officials were drafting new professional conduct rules for members of the bar. The state bar cite stated that the rules would become effective November 1, 2018. One particular Rule is: Rule 8.4.1 that allows the state bar to investigate a lawyer without a prior civil finding.  Now Plaintiff will request in the Prayer for Relief that this Court orders the FBI to turn over all of the attorney complaints sent to FBI to the  state bar investigate  attorneys named in 2:16-cv-08434-GHW(FMo)(exh.6)to be investigated.

<u>Conclusion</u>

137.   Plaintiff's parents the late Kate and the late Ben Baker were married on March 3, 1940. After serving in World War II Ben Baker joined with two brothers, Harvey Lowey and Bert Lowey, to start Apex Wholesale Produce, Inc. around 1950. Kate and Ben Baker would then spend the next 40 years working very hard and paying taxes. Ben Baker would usually arise around 2am to get to his produce company in downtown Los Angeles. Kate Baker would spend countless hours raising three children. By the time Ben Baker died in 1993 they had amassed a sizable amount of money. In 1995 Kate Baker then being 76 years old transferred the hard earned money into Ameriprise for safe keeping and earning potential only to be financially abused in a way that is almost like a Greek tragedy. At the beginning of 1996, plaintiff also transferred a great deal of money into Ameriprise for safe keeping and earning potential, and likewise as his mother, was financially abused. The Baker Family accounts were held by the Probate Court on November 18, 2013 to be individual accounts and not Probate/Estate claims which is the basis of this Complaint and 2:16-cv-08434-GHW(FMo). Plaintiff has been the focus of violations of the very core of human decency by the very governmental entities entrusted to protect us. And finally to quote the British

Statesmen and Prime Minister William Gladstone- "Justice that is too long delayed is Justice denied."

## V.   **Claims for Relief:**

<div align="center">

First Claim for Relief

(Against defendants)

(Unreasonable Restraint of Trade)

(Sherman Act, 25 US C § 1)

</div>

138.   Plaintiffs refer to paragraphs 14-137, above and by such     reference incorporate same herein as if set forth in full.

139.    All defendants have unreasonably restrained competition by and through the control of their agents to insist that their agents, by the use of incentives and other pressure techniques to sell there in-house products which have consistently underperformed to their clients, the Plaintiffs in the instant case.

140.   The Defendants have unreasonably restrained competition by and through the complete control and monopoly of access to the state court systems and  which can be had only through the use of its members.  In addition, only its members have access to private companies which are mandatory to engage in the discovery process.  Also, to engage attorneys for "appearances", the companies that provide such services are limited solely to    members of the bar.

141.    The original purpose of the Bar was to provide for the safety and welfare of its residents of access to the court systems to maintain the dignity and a certain level of expertise which is necessary to practice law.

142.   Because of the unreasonable restraint of competition, Plaintiff was forced to spend hundreds of thousands of dollars only to be deceived from each attorney or law firm retained as detailed in the factual allegations.

PLAINTIFF'S FIRST COMPLAINT FOR ,ADA, FEDERAL TORT CIVIL CLAIMS ACT.

,  61

143.    These actions of Defendant's constitute unreasonable restraint of trade and commerce and therefore violate § 1 of the Sherman Antitrust Act.  15 U.S.C. § 1.)

## Second Claim for Relief:
### (Against Defendants except State Bar and Wilson)
### (The Investment Advisers Act of 1940)
### (15 USC §§ 80(b) 1-1 through b-21)

144.    Plaintiffs refer to paragraphs 14-137 above and by such     reference incorporate same herein as if set forth in full.

145.    Defendants, and each of them,  actions as described in paragraph above,  that were deceptive, manipulative and  misleading co-conspirators with respect to the securities that were sold to Plaintiffs were  in  violations of 15 USC §§ 80b-1 through 6-21.

## Third Claim for Relief
### (Against Defendants except State Bar and Wilson)
### ((The Securities Investor Protection Act of 1970)
### (15 USC §§ 78aaa through 78111))

146.    Plaintiffs refer to paragraphs 14-137, above and by such     reference incorporate same herein as if set forth in full.

147.    Defendants., and each of them, actions  as described in paragraph above, that were deceptive, manipulative  and misleading co-conspirators with respect to the securities that were sold to Plaintiffs were in violations of 15 USC §§ 78aaa through 78111.

## Fourth Claim for Relief:
### (Against all defendants)

## R.I.C.O.

### ((18 U.S.C. § 1961 et seq.)

148.   Plaintiffs refer to paragraphs 14-137, above and by such     reference incorporate same herein as if set forth in full.

149.   At all material times herein, all Defendants where associated with enterprises engaged in activities  which affected interstate commerce. Those enterprises consisted of all defendants.  These enterprises had on going organizations with a framework for making decisions, functioned as continuing units and had ascertainable structures and systems of authority guiding their operations, separate and apart from the pattern of racketeering in which each enterprise engaged herein outlined.

150.   The Defendants and each of the other aforesaid persons or entities who were part of the aforesaid enterprises conspired to conduct and participate in the conduct of the affairs of the aforesaid enterprises, and they conducted and participated , directly and indirectly in the conduct and affairs of the said enterprises  though a  pattern of  racketeering  activity.

151.   Defendants entered into an agreement with Dykema who represented American Express not to investigate Fairshter  competently to make sure Fairshter would  be found not guilty of criminal acts that a federal court found Fairshter found him guilty of.

152.   Defendants  entered into an agreement with Phan and R&P who had previously consulted and advised Ameriprise Financial, Inc. counsel both Dykema and Eagerton & Weaver and therefore, was part of the concerted enterprise  to cause Plaintiffs serious financial loss.

153.   Defendant's  entered into agreement with Glickman who previously had entered into agreement with  Luan Phan and R&P who had Ameriprise Financial, Inc., American Express, counsel Dykema and Eagerton & Weaver, was part of the concerted enterprise to cause Plaintiff serious financial loss.

154.   Defendant's entered into agreement with Glickman & Stern who previously had entered into agreement with Ameriprise Financial, Inc., and their counsel Dykema , Eagerton & Weaver, was part of the concerted enterprise to cause Plaintiffs serious financial loss.

155.   Defendant"s  entered into agreement with Langer and Glickman who had previously  had entered into agreement with Phan and R&P who had previously consulted and advised AEFA, American Express, counsel both Dykema and Eagerton & Weaver and therefore, was part of the concerted enterprise  to cause Plaintiffs serious financial loss.

156.   The pattern of racketeering activity consisted of repeated acts of mail and wire fraud,  threatening of witnesses, which constitute an essential part  of or were incidental  to an essential element  of the aforesaid schemes and artifices  to defraud Plaintiffs, for which unlawful acts and conduct of attempted extortion and extortion, payoffs and bribery were directly  in the administration and enforcement of the racketeering activity and predicate acts in furtherance of the aforesaid enterprise, in which all of the Defendants  participated.

157.   Defendant's  knew or should have known that the statements made to Plaintiff's regarding control of Plaintiff's  accounts were false and/or misleading and said defendants, and each of them, concealed such information from Plaintiffs.

158.   Defendants knew or should have known that the failure on their parts to disclose the inter-relationships of the law firms and/or the conflicts of interests were false and/or misleading and said defendants, and each of them, concealed such information  from Plaintiffs with intent to deceive  and mislead Plaintiffs.

159.   .The pattern of racketeering activity directly and proximately damaged Plaintiffs, who suffered financial loss as a result of the fraudulent activities of the Defendants, and each of them

160.   Such pattern of racketeering activity constituted mail fraud violations of 18 U.SC. § 1341, wire fraud violations 18 USC § 1343., conspiracy to obstruct justice 18 USC § 1962(d), financial institution fraud 18 USC § 1344 tampering with a witness 18 USC § 1512, obstruction of justice 18 USC § 1503, interference with commerce, robbery or extortion 18 USC § 1952. and involved dissemination through the mail and by telephone and facsimile, of false and fraudulent pretenses, representations and promises, in order to obtain money from Plaintiffs for trade and/or transaction fees and legal fees incident to the essential parts of the aforesaid schemes and artifices to defraud.

161.   The Defendant's were co-conspirators of sending false representations and promises and the dissemination through the mail and by telephone included, but were not limited to: (a) the use of the mail to disseminate information promoting financial investment and investment products being offered by Ameriprise Financial Inc. ; (B) the use of the telephone and facsimile to disseminate information promoting financial investment products being offered by Ameriprise Financial, Inc. ; (c) the use of the mail, telephone and facsimile to obtain Plaintiffs authorization to make certain investments trades and agree to various fee arrangements; (d) the use of the mail, telephone and facsimile to arrange and carry out the administration of the investment trades and various fee arrangements made on behalf of Plaintiffs; (e) the use of mail, telephone and facsimile to obtain Plaintiffs signature on various documents that consented to and/or acknowledged the investments trades and agreed to various fee arrangements with various Defendants were co-conspirators by ; (f) the use of the mail, telephone and facsimile to issue notices, demand, billings and collection information for information for investments with Ameriprise; (g) the use of the mail, telephone, and facsimile by Ameriprise , to deprive Plaintiff of monies rightfully due to him pursuant to 2002 Settlement Agreement;(h) ;the use of the mail, telephone and facsimile by Defendant's as co-conspirators of the Defendants

in 2:16-cv-8434-GHW(FMo) to thwart Plaintiffs from having a full hearing on the merits of his case against, Ameriprise, and Cohen before the L.A. Superior Court case #060762, the NASD(now FINRA); (i) the use of the mail, telephone , and facsimile by Ameriprise ,,  to deprive Plaintiff of entering into a fair and reasonable 2002 Settlement Agreement. (j) the use of the mail, telephone and facsimile Ameriprise to conceal documents relevant to Plaintiffs claims to the NASD proceeding and conspiring with Defendants in 2:16-cv-08434-GHW(FMo)(exh 6) to destroy said documents; (k) the use of the mail, telephone, and facsimile by Defendants in 2:16-cv-08434-GHW(FMo)(exh. 6) to delay Plaintiffs' claims against Ameriprise, Cohen., being heard by any competent court or forum prior to American Express Financial Advisors Inc. spinning off Ameriprise as a separate subsidiary ; and (l) the use of the mail, telephone, and facsimile to issue notices, demands, billings and collection information for legal billings and dissemination of false information from B&F, Dykema and R&P firm.   The specific acts of the various Defendants which are incident to the essential parts of the aforesaid schemes and artifices are set forth in Paragraphs above.

162.    The predicate acts, set forth above, by Defendants, and each of them, against Plaintiffs occurred after the enactment of the Racketeer Influence Corrupt Organization Act, 18 USC §1961, et seq,

163.    Each of the acts of Defendants, and each of them, as described herein was conducted for the purposes of furthering the Defendants' scheme to promote and to continue the false and fraudulent pretenses, statements and promises, and to thereby defraud Plaintiffs and to gain and profit at Plaintiffs' expense by interfering with Plaintiffs' right to obtain a full hearing on the merits of his allegations against Ameriprise, and Cohen.

164.    Each of these said acts of the Defendants, and each of them, regarding the Plaintiffs had similar purpose, involved the same or similarly situated acts

thus constituted a pattern of racketeering activity with the meaning of the
Racketeer Influence Corrupt Organizations(R.I.C.O.) Act, 18 USC §1961 et seq.

165.   As a direct and proximate cause of the activities of Defendants, and each
of them, which were violative of the Racketeer Influence Corrupt Organizations
Act.  Plaintiffs suffered substantial loss and damages of there properties.  The loss
entitles Plaintiffs to recover treble damages against Defendants, and each of them,
and costs of suit, and the attorneys fees paid out as stated in 2:16-cv-08434-
GHW(FMo) pursuant to 18 USC § 1961

<u>Fifth Claim for Relief</u>
(Against all Defendants)
Due Process
(5th amendment & 14th Amendment)

166.   Plaintiffs refer to paragraphs 14-137, above and by such reference
incorporate same herein as set forth in full.

167.   Plaintiffs were denied due process by the Defendants, and each of them,
as guaranteed in the Americans with Disabilities Act(ADA) as factually asserted
in paragraphs above.

168.   Plaintiffs were denied due process and equal protection of the laws when
Defendants co-conspired with Defendants in 2:16-cv-08434-GHW(FMo)(exh. 6)
compelled Plaintiff to go In Pro Se in the Probate Case knowing that Plaintiff
would not be able to represent the Estate nor do discovery as to be in violation of
the law. Although eventually, Plaintiff would be able to do some discovery which
lead to the receipt of account documents incriminating Allen.

169.   Plaintiffs due process rights were violated when Defendant's  caused
Defendants in 2:16-cv-08434-GHW(FMo)(exh. 6)to not  re-file Plaintiffs claim
against AEFA and Cohen in either State Superior Court or Federal Court pursuant
to NASD Code § 10305.

170. Plaintiffs were denied due process by the Defendants, and each of them, in the original 2002 Settlement Agreement as a Probate Court Order for reasons detailed in paragraphs above.

171. Plaintiffs were denied due process by the Defendants, and each of them, as guaranteed in the equal protection clause of the 14th amendment of the US. Constitution.

172. Plaintiffs were denied due process by the Defendants, and each of them, when Plaintiff did not have a full trial in the Superior Court in 2002 as detailed in paragraphs above.

173. Plaintiffs were denied due process by the Defendants, and each of them, when Plaintiffs did not get a hearing on the merits of the case in the NASD as detailed in paragraphs above.

174. Plaintiffs were denied due process by the Defendants, and each of them, in the Superior court hearings in 2006 as detailed in paragraphs above.

175. Plaintiffs were denied due process by the Defendants, and each of them, when the appeal was filed in 2007 after the Superior Court case number LC 060762.

176. Plaintiffs were denied due process by the Defendants, and each of them, in the Federal Court case #CV-09-3179-GHW. The federal district judge knew of the Defendants intrusion into the case and, basically went along with it to violate the due process rights and the vicissitudes of the due process rights which continue until the present time.

177. Plaintiff was denied due process by the Defendants, and each of them, when Plaintiff was denied access to the use of members of the bar, paralegals, attorneys services, and court reporters services i.e. LA Reporters.

178. Plaintiffs were denied due process by Defendants co-conspired with the state bar when Plaintiff filed attorney complaint against Matthew Fairshter and Joel Bennett and it was inappropriately handed by principal investigator Michael

O Chavez to such an extent that FBI special agent knew that the complaint would result in a letter stating that Chavez found that Fairshter and Bennett had committed no violations of ethics or criminal conduct. The finding of no violations was specifically orchestrated by the co-conspiratorial actions of the Defendants.

179.   Plaintiffs were denied due process by the Defendants, and each of them, in the Ameriprise State Case BC435030, where Plaintiffs did not get a fair hearing and were demurred out.

180.   Plaintiffs were denied due process by the Defendants, and each of them, in the legal malpractice case BC394851 in that Plaintiff was advised that the case was for seeking damages for both the Plaintiffs personal account at AEFA and the Baker Family accounts at AEFA and on May 30, 2012, Plaintiff learned that the case was solely about Plaintiffs personal account.

181.   Plaintiffs were denied due process by the Defendants, and each of them, in the legal malpractice case BC408161 since Plaintiff never received a trial on the merits due to the unethical and false statements by Stern  when he withdraw as counsel.

182.   Plaintiff is denied due process by the Defendants, and each of them, in compelling this Plaintiff to pay the filing fee of $350 to file this complaint  in the hope of obtaining due process of the 14th amendment of the US. Constitution.

183.   Plaintiff is denied is due process rights by the Defendants, and each of them, in compelling the Plaintiff to spend countless hours in preparing this complaint in the hope of obtaining due process of the 14th amendment of the US. Constitution.

## Sixth Claim for Relief
### (Against all Defendants)
### (Elder Abuse and Dependent Adult Protection Act)

(California Welfare & Institutions Code § 15600 et seq.)

(Disinherited Probate Code sect. 259)

(

184.   Plaintiffs refer to Paragraphs 14-137, above and by such reference incorporate same herein as set forth in full.

185.   All times relevant to this action occurring prior to 2019,  Plaintiff  was a dependant  adult as defined under the Elder Abuse and Dependant Adult Civil Protection Act (hereinafter "EADACPA") and specifically under California Welfare & Institutions Code § 15600.23(a) who suffered from various limitations that restricted his ability to carry out normal activities or to adequately protect his rights.  Obviously, any statute of limitations has been tolled until the original LC060762 case is judiciously corrected  similarly as the original Settlement Agreement of May 2, 2002  was on November 18, 2013.

186.   At all times relevant to this action, Plaintiff was first a dependent  adult as defined under EADACPA and then after December 20, 2015 qualifies under EADACPA as an adult over 65 years old.

187.   At all times relevant to this action, Defendants co-conspired with defendants in 2:16-cv-08434-GHW(FMo)(exh. 6) to cover-up the funneling of millions of dollars of money from the Baker Family accounts to Allen R. Baker Family Trust pursuant to Probate Code Section 259.. And Defendants co-conspiring the incontrovertible evidence that monies were funneled from the Baker family Trust to  Frank A. Baker pursuant to Probate code sect. 259.

188.   At all times relevant to this action, Defendants co-conspired with Defendants in 2:16-cv-98434-GHW(FMo)(exh. 6) stood in a position of trust  to Plaintiffs  in that said Defendants , and each of them, created the fiduciary relationship of a financial and/or legal advisor

189.   All Defendants violated the EADACPA by allowing various law firms to take Plaintiff's monies in the form of legal fees and by falling to clearly

disclose the inter-relationships between said law firms(i.e. that Comanor, who recommended Bennett to Plaintiff as a lawyer; had acted as an expert witness for brokerage firms, including Ameriprise entities  and that Donahue had worked with one of the lead lawyers for Ameriprise entities of the SEC in  Los Angeles).

190.   Defendants co-conspired with B&F, Dykema, and R&P when they allowed   and encourage others to be silent and not  to disclose the conflicts of interest between the Dykema  firm on the one part and Ameriprise entities, on the other part, until after the NASD removed  Plaintiff's claims against Ameriprise entities  to the Superior Court and only disclosed  said conflict on the eve of the Superior Court hearing to reopen  Plaintiff's Superior Court Case  causing additional delay in Plaintiff's right to speedy determination  of his grievances. In May 2011, Plaintiff believes that defendants co-conspired with B&F, David, R&P, Dykema, Chia, Bennett, Fairshter, Donahue, Phan, knew at the time of the NASD ruling that it was part of the scheme/plan to deceive Plaintiff that he had to reopen the former Superior Court Case, otherwise Plaintiff would not have been barred by the Statute of Limitations.

191.   Defendants Ameriprise entities knew or should have known that the statements made to Plaintiff regarding control of Plaintiff's  accounts were false and/or misleading and said defendants, and each of them, concealed such information from Plaintiff.

192.   Defendants co-conspired with law firms who knew or should have known that the failure on their parts to disclose the inter-relationships of the law firms and/or the conflicts of interests were false and/or misleading and said defendants, and each of them, concealed such information from Plaintiffs with intent to deceive and mislead Plaintiffs.

193.   The conduct of Defendants, and each of then, as described and alleged herein, constituted fiduciary abuse as defined in California Welfare & Business Code  § 15610 (f).

194.   Defendants, and each of them, are guilty of recklessness, oppression, fraud and malice in the commission of the financial abuse of Plaintiffs described and alleged in this Complaint.

195.   Under California Welfare and Institutions Code § 15657 (a) , Defendants , and each of them, are liable for reasonable attorneys fees and costs and for treble damages pursuant to California Civil Code § 3345.

Seventh Claim of Relief

(Against all Defendants)

(FRAUD)

196.   Plaintiffs refer to paragraphs 14-137 above and by such reference incorporate same herein as set forth in full.

197.    The Defendants, and each of them, perpetrated on the Plaintiff resulted in the Plaintiffs severe financial loss.

198.   The Defendants acts were the direct and proximate cause of Plaintiff's severe financial loss.

Eight claim of Relief

(Against all Defendants)

(Breach of fiduciary Relationship

And Federal Fiduciary Rule: 29 CFR

Parts 2509, 2510 and 2550 eff. April, 2017)

199.   Plaintiff refer to paragraphs 14-137, above and by such reference incorporate same herein as set forth in full.

200.   At all times relevant to this action, there existed between Plaintiff and Defendants, and each of them, a fiduciary and/or confidential relationship upon which  Plaintiff justifiably relied on to their detriment.  By virtue of their relationship between Plaintiffs and Defendants, and each of them, fiduciary duty

existed.  Pursuant to said duty, Defendants, and each of them, owed the utmost good faith and fairness to Plaintiffs in all matters pertaining to Defendants 'conduct with respect to Plaintiffs ' assets and property.

201.    Defendants, and each of them, accept the reliance of Plaintiff's of the fiduciary and/or confidential relationship.

202.    Defendants, and each of them, breached the aforesaid duty as alleged herein, and in doing so gained an advantage over Plaintiff in matters relating to the management and control of Plaintiff' assets and Plaintiff' Accounts.  In particular and without limiting the generality of the foregoing , in breaching said duty(ies) as alleged herein, Defendants, and each of them, are required to disgorge their profits, and Plaintiff are entitled to an aware in the amount of these profits, interest on all such sums from date of injury.

### Ninth  Claim for Relief

(Against all Defendants)

(False Pretenses/Conversion).

203.    Plaintiffs refer to paragraphs 14-137, above and by such reference incorporate same herein as set forth in full

204.    Obtaining property by false pretenses is when a person obtains property by intentionally misrepresenting a past or existing fact. Plaintiff gave the Defendants as listed in FAC in 2:16-cv-08434-GHW(FMo)(Exh. 6)

205.    Defendants, and each of them, co-conspired with the defendants in 2:16-cv-08434-GHW(FMo)) when they committed the act of False Pretenses/conversion when they deceived Plaintiff in thinking that Defendants were gong to do actions that they had promised whether in the nature of financial advice and/or legal advice and, instead, took the monies with no intention of providing such services.

## Tenth  Claim for Relief.

(Against all Defendants)

(Americans with Disabilities Act(ADA))

( 42 USC  §§ 12101  et seq.)

206.   Plaintiff refer to paragraphs 14-137, above and by such reference incorporate same herein as set forth in full

207.   Defendants, each of them, deprived Plaintiffs of Plaintiffs' federal and state  constitutional and /or statutory right by failing to provide Plaintiffs with the legal and financial services that they promised to provide since each of the defendants had specific knowledge that the Plaintiff suffered from  reading, writing and thinking  disabilities as detailed in ADA.

208.   Defendants, and each of them, deprived Plaintiff of access to quality of life experienced by most Americans when they treated Plaintiff's disabilities as though they were physical disabilities as oppose to being psychological in nature. When a disability is  psychological in nature it can take years to treat and therefore, any issue to bringing a claim based upon ADA must be tolled until recovery is had.  In instant case, Plaintiff is still recovering.

209.   Defendants, and each of them, co-conspired with the Defendants of 2:16-cv-08434-GHW(FMo)(exh. 6) and  did so   under the color of state law when Defendants, and each of them, deprived Plaintiff their federal rights, property interests and otherwise discriminated against Plaintiff based on Plaintiff's thought disorder. Under ADA there is an abrogation of sovereign immunity.

210.   Defendants, and each of them, co-conspired with the Defendants of 2:16-cv-08434-GHW(FMo) to interfere with Plaintiff's psychoanalysis and mental development, his main disability,  when they bled Plaintiff of his funds which Plaintiff was using to pay for his psychoanalysis instead to pay for attorneys, forensic accountant, etc.

211.   As a direct and proximate result of Defendants' violations of  42 USC §§ 12101   et seq, Plaintiffs  have sustained  grave financial loss.


<p align="center">Eleventh  Claim for Relief</p>

<p align="center">(Professional Legal Malpractice: Fraud)</p>

<p align="center">(Against Defendant AUSA Benjamin Lichtman and all Attorneys who were acting as agents or in some other capacity for the AUSA in the legal situation as described above, State Bar)</p>

<p align="center">(CA Business and Professions Code § 1068)</p>

212.   Plaintiff refer to paragraphs 14-137, above and by such reference incorporate same herein as set forth in full

213.   All Defendant law firms did perform their legal services with the intent to deceive, manipulate Plaintiffs to Plaintiffs' great financial loss.

214.   Such fraudulent and deceitful acts of defendants' law firms or through their agents violated Business and Professions Code § 1068.


<p align="center">Twelfth  Claim of Relief</p>

<p align="center">(Under Color of Authority)</p>

<p align="center">(Against defendants))</p>

<p align="center">(Title 18, USC. Section. 242)</p>

215.   Plaintiff refers to paragraphs    14-137, above and by such reference incorporate same herein as set forth in full.

216.   Plaintiff alleges that Defendants   in their official capacities violated plaintiffs deprivation of rights when they orchestrated the to carry out the scheme as detailed in the factual allegations above under Title 18, USC Section. 242;

217.   Plaintiff, alleges, Defendants, in their official capacities, orchestrated interference with plaintiff being able to retain attorneys and/or causing the

attorneys after retention to withdraw from representation violating the Business and Professions Code.

<div align="center">Thirteenth  Claim for Relief.</div>

<div align="center">(Against All Defendants)</div>

<div align="center">(Doctrine of Fraudulent Concealment/Fraud on the Court)</div>

218.   Plaintiff refers to paragraphs  14 to   137   , above and by such reference incorporates same herein as set forth in full.

219.   Plaintiff argued both of these doctrines Fraudulent Concealment/Fraud on the Court in the US Supreme Court Petition for Certiorari Case #15-228. Plaintiff will incorporate by reference certain portions of the Petition which is attached as Exhibit 5(cover sheet of Petition and pages 25-39): specifically pages 25-39 are incorporated by reference herein which speaks to the issues of the judicially created exceptions of fraudulent concealment and fraud of the court to protect the plaintiff in this case against defendants who conspired to fraudulently concealment certain facts that go to the core of the case and caused great delay now being  19 years since the death of  Kate Baker

<div align="center">Fourteenth Claim for Relief</div>

<div align="center">Federal Torts Claims Act.</div>

<div align="center">(Title 4: 28 U.S.C. Pt. VI, Ch. 171)</div>

<div align="center">(Against all Defendants)</div>

220.   Plaintiff refers to paragraphs 14 to 137, above and by such reference incorporates same herein as set forth in full.

221.   Plaintiff alleges that all Defendants, in their official capacity interfered with Plaintiff legal counsels, the judiciary, STATEBAR and the NASD(now FINRA) and causing harm in that Plaintiff and the Estate of Kate Baker's due process rights to achieve civil damages within a reasonable time.

222.   The Act usually is for negligence but on occasion it has been used where there is intentionality.

223.   Plaintiff alleges that Defendants acts were instrumental along with acts of Defendants in 2:16-cv-08434(GHW(FMo) as  the actual and proximate cause of the civil damages sustained by the Plaintiff. Plaintiff alleges that Defendants acts are the actual and proximate cause that made sure that Plaintiff could not keep counsel nor return counsel. Also, Defendants acts were the actual and proximate cause of attempting to get Plaintiff to sign a Release of Allen and Franks tortious(and criminal acts) covering up the illegal transfer of monies from the Baker Family Trust to Allen R. Baker Family Trust which Plaintiff did NOT sign. Additionally, Defendants acts were the actual and proximate cause of attempting to cover up the forgeries of Plaintiff signature on several documents, including but not limited to CNB bank documents, checks from Ameriprise entities.

II.   Prayer for Relief

PLAINTIFF respectfully request this Court order, adjudge and decree:

A. Plaintiff be awarded damages according to proof.

B. Plaintiff recover from Defendants, and each of them, threefold in actual damages sustained as a result of said Defendants' federal antitrust, RICO and unfair competition violations.

C. Plaintiff be awarded interest on all damages sustained by Plaintiff from January 2000 to the present time calculated according to the 10% under the law.

D. Defendants   conduct as alleged , unlawful  under Section 1 of the Sherman Act(15 USC  § 1)

E.  Plaintiff recover from Defendants, interest and reasonable attorney fees as provided by the RICO Act and the California Welfare and Institutions Code for Elder Abuse. Because plaintiff is In Pro Se attorney fees may not be recoverable.

F.  Plaintiff recover from Defendants, and each of them, punitive and exemplary damages for Elder Abuse as defined in the Welfare and Institutions Code § 15600 et seq.

G.  Disgorgement from Defendants, and each of them, the profits they obtained from Plaintiff as a result of said Defendants' elder abuse and pursuant to the RICO act.

H.  Plaintiff be awarded such other and further relief in law or in equity as the Court may deem just and proper.

PLAINTIFF respectfully request this Court order, adjudge and decree the following Declaratory Relief:

1)  This Court order AUSA office and/or the FBI to deliver to Plaintiff the entire file of the federal investigation since it was initiated as part of discovery.

2)  This Court order the FBI to deliver to the State Bar Investigative Unit all attorney complaints forwarded to the FBI by plaintiff since requested by the FBI on October 15, 2007 so that investigations can be initiated.

3)  This Court order that the STATEBAR, when an investigation of a member is instituted by the STATEBAR's investigation unit, such will be noticed on the individual's attorney member Calbars website page. Furthermore, that such member shall notify any current client or prospective client that such investigation has commenced. This notification shall be in writing.

4)  This Court order the U. S. Department of Justice, Civil Rights Division which houses the Americans With Disabilities Division to formulate new Rules and Regulations so that children and adolescents up to the age of to

due to a stroke and/or head trauma and therefore, to a speech pathologist) and autistic symptoms.

February  18, 2019

ROBERT BAKER

In Pro Per

# Exhibit 1

NASH & EDGERTON LLP
SAMUEL Y. EDGERTON, III (CA Bar No. 127156)
CHAD WEAVER (CA Bar. No. 191984)
BRANDON S. REIF (CA Bar No. 214706)
2615 Pacific Coast Highway, Suite 300
Hermosa Beach, California 90254
Telephone: (310) 937-2066
Facsimile: (310) 937-2064

Attorneys for Defendants
American Express Financial
Services and Stanley Cohen

**FILED**
LOS ANGELES SUPERIOR COURT

AUG 16 2002

JOHN A. CLARKE, CLERK

BY M. ALBUREZ, DEPUTY

ORIGINAL

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

ROBERT BAKER, an individual

Plaintiff,

v.

AMERICAN EXPRESS FINANCIAL
SERVICES, STANLEY COHEN and
Does 1 through 10

Defendants.

CASE NO. LC060762

DECLARATION OF ALLEN BAKER IN
SUPPORT OF AN ORDER
DISCHARGING DEFENDANTS-
STAKEHOLDERS AMERICAN EXPRESS
FINANCIAL SERVICES AND STANLEY
COHEN FROM LIABILITY; AWARDING
COSTS AND FEES; DISMISSAL OF
DEFENDANTS

Complaint filed: May 3, 2002
Hearing Date: August 23, 2002
Department: NW Q
Time: 8:30 a.m.

I, ALLEN BAKER, declare as follows:

1.  I am over eighteen years of age and not a party to this action;

2.  I am duly licensed as a dentist in the State of California;

**Background**

3.  Robert is a professional student. He completed law school (never passed any state bar examination), earned a masters degree in financing (never passed any certified public accountant examination) and has a masters degree in psychoanalysis, among other professional

1

DECLARATION OF ALLEN BAKER IN SUPPORT OF AN ORDER TO DISCHARGE DEFENDANTS-STAKEHOLDERS

1    accolades. To my knowledge, in the past 10 years, Robert has never filed a state or federal

2    income tax return showing any source of income. To my knowledge, he has never held a

3    paying job;

4   4.    Robert, our other brother, Frank Baker ("Frank"), myself and the Baker extended family knew

5    in 1985 that our mother, Kate Baker ("Kate"), established the Robert Baker Trust ("Trust").

6   5.    Robert *knew* about the existence of the Trust as of the date of its creation or, at the very latest,

7    in the early 1990s, after Kate transferred the Robert Baker Trust securities account ("Trust

8    account") from Merrill Lynch, Pierce, Fenner & Smith, Inc. to Bear, Stearns & Co., Inc. In

9    March 1996, Kate again transferred this account to defendants American Express Financial

10    Services ("AEFS") and AEFS representative Stanley Cohen ("Cohen");

11   6.    Kate was the settlor and trustee of the Trust and Robert was the beneficiary only. Robert had

12    no right to liquidate the Trust. The Trust empowered the trustee with discretionary authority to

13    distribute to Robert Trust proceeds;

14   7.    Kate regularly discussed with me the management of the Trust account. Kate was concerned

15    about Robert's well-being. She instructed Cohen and I that Robert must have *no authority* to

16    effect transactions in the Trust account;

17    **Kate Funded The Trust**

18   8.    Kate sourced the Trust account with personal funds;

19   9.    Kate also sourced every deposit (cash, securities or other) into the Trust account. This

20    includes the alleged $320,000.00 and $600,000.00 that Robert claims was his own money.

21    Indeed, Kate not only sourced these funds, but directed Robert to deposit them in the Trust.

22    The claim that the money was Robert's personal money is false;

23   10.    Kate also purchased two homes for Robert, one in West Los Angeles, California and the other

24    in Woodland Hills, California. Upon selling the Woodland Hills home, Kate sourced the

25    proceeds to the Trust. Kate also purchased land in Hollywood, California. Upon selling the

26    Hollywood land, Kate sourced the proceeds to the Trust;

27   11.    Kate also provided Robert with $5,000.00 monthly income distributions from the Trust. In

28

<center>2</center>

DECLARATION OF ALLEN BAKER IN SUPPORT OF AN ORDER TO DISCHARGE DEFENDANTS-STAKEHOLDERS

1    short, Kate fully supported Robert financially;

2   12.   Kate directed every transaction in the Trust account;

### Plaintiff Tries To Break The Trust

4   13.   In or about 1998, Robert created a revocable trust document for Kate to sign, which allowed

5    Robert to liquidate the Trust upon Kate's death. Kate refused to execute this document as it

6    would essentially break the Trust and authorize Robert to liquidate the Trust funds;

7   14.   In or about November 1999, Kate was suddenly ill due to a complication relating to her

8    terminal cancer. She was admitted to the hospital;

9   15.   While Kate was in the hospital, Stanley Cohen telephoned me. He asked where my mother

10    was because his numerous telephone calls were not returned. I informed Cohen that Kate was

11    admitted to the hospital;

12   16.   I was present at the hospital when Cohen informed Kate that Robert tried unsuccessfully to

13    liquidate the Trust for his personal use. Kate informed Cohen that the Trust stands as is and

14    Cohen is to not break the Trust at the behest of Robert;

### Allen Becomes Successor Trustee

16   17.   Kate died on January 28, 2000;

17   18.   Upon her death, I became successor trustee. While I knew that I would be trustee, I did not

18    know what that meant. I only accepted this role because that was Kate's wish;

19   19.   I instructed Cohen to continue to manage the Trust in accordance with Kate's original

20    instructions;

21   20.   In or about February 15, 2000, Robert requested that he have a "say" in the investments of the

22    Trust. I permitted Robert to suggest prospective investments for the Trust account. However,

23    I instructed Robert and Cohen that Robert is to make no transactions in the Trust account

24    without my expressed authorization. I directed Cohen to first discuss with me any investments

25    requested by Robert with regard to the Trust. Because Robert suggested only speculative

26    investments (such as QQQ and hi-tech stocks), I rejected each of Robert's suggestions;

### Robert Initiates Litigation To Break The Trust

3

21. Kate's will devised her assets in equal shares to Frank, Robert and I. Robert, unlike Frank or I, was still bound to the Trust. There was no provision authorizing Robert to liquidate the Trust for his personal use;

22. Robert sued Kate's estate, Frank and I. Robert alleged, among other things, that the Trust and Trust account should be liquidated (the "estate litigation");

23. In the estate litigation, Robert claimed that all the money in the Trust was his own personal money. However, Robert provided not one piece of evidence at his deposition to prove this claim. Under questioning by my lawyer, Robert *admitted* that:

   a. *all his money in the Trust were sourced by Kate;*

   b. *he knew and understood that the money sourced by Kate were directed to the Trust;* and

   c. *less than one hundred dollars ($100.00) — of the hundreds of thousands of dollars in the Trust — was sourced by Robert's aunt.*

24. Robert sourced zero funds into the Trust;

25. In or about December 2001, Robert, Kate's estate, Frank and I entered into a mediated settlement agreement. As part of the settlement, I gladly resigned as successor trustee to be succeeded by City National Bank;

26. On July 17, 2002, I received the transfer documents from Cohen and immediately executed them and sent them back to Cohen;

27. In addition, I have had numerous conversation with Mr. Bryant at City National Bank wherein I agreed to fully cooperate with City National Bank to expedite the documents necessary to effect the transfer of the Trust money from AEFS to the new Robert Baker Trust with trustee City National Bank;

28. As of this date, Robert never executed the documents to transfer the Trust. Instead, he is refusing to complete the transaction, for what reasons I do not understand;

29. When the estate litigation began, I instructed Cohen to not transact in the Trust account until the estate litigation was resolved;

4

30. After the estate litigation settled, I instructed Cohen to stop distributing monthly income to Robert in the amount of $5,000.00;

**Robert's Dispute with AEFS and Cohen – Interpleader**

31. At end of business on July 18, 2002, I returned a telephone call to Brandon S. Reif, counsel for AEFS and Cohen. We discussed the dispute concerning the Trust;

32. I advised Mr. Reif that as of December 2001, the date the parties to the estate litigation executed the stipulation, I was no longer the trustee of the Trust. Further, as of July 17, 2002, I executed the transfer papers, the same day I received them, to have City National Bank succeed me as trustee of the Trust;

33. Mr. Reif asked me whether I would object to releasing any Trust assets to Robert. I advised Mr. Reif that I will not agree to release any funds to Robert personally — only funds into the Trust account with AEFS or City National Bank.

I certify (or declare) under penalty of perjury that the foregoing is true and correct:.

Executed on August _15_, 2002, in _Hidn Hills_, California.

ALLEN BAKER

P:\DATA\AEFA\Baker\Interpleader Discharge Cohen Allen Baker.affdvt

5

DECLARATION OF ALLEN BAKER IN SUPPORT OF AN ORDER TO DISCHARGE DEFENDANTS-STAKEHOLDERS

1                      PROOF OF SERVICE

2 STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3      I am employed in the County of Los Angeles.  I declare that
I am over the age of eighteen (18) and not a party to this
4 action.  My business address is 2615 Pacific Coast Highway, Suite
300, Hermosa Beach, California  90254.

5
     On August 16, 2002 I served the following document described
6 as:

7 **DECLARATION OF ALLEN BAKER IN SUPPORT OF AN ORDER DISCHARGING
DEFENDANTS-STAKEHOLDERS AMERICAN EXPRESS FINANCIAL SERVICES AND
8 STANLEY COHEN FROM LIABILITY; AWARDING COSTS AND FEES; DISMISSAL OF
DEFENDANTS**

9
on the interested parties in this action by placing the true copies
10 thereof enclosed in sealed envelopes as follows:

11 William F. Davis, Esquire
11400 W. Olympic Blvd., Ste. 200
12 Los Angeles, California 90064

13 ( )   I deposited such envelope in the mail at Hermosa Beach,
       California.  The envelope was mailed with postage thereon fully
14        prepaid.

15 ( )   By Personal Service, I caused such envelope to be delivered by
       hand to the individuals at the addresses listed.
16
17 (X)   By overnight courier, I caused the above-referenced document(s)
       to be delivered to an overnight courier service (Federal
       Express), for delivery to the above addressee(s).
18
19 (X)   By facsimile machine I caused the above-referenced document(s) to
       be transmitted to the above-named person at the above fax
       numbers.
20
21 (X)   (STATE)  I declare under penalty of perjury under the laws
       of the State of California that the above is true and
       correct.
22
23 ( )   (FEDERAL) I declare that I am employed in the office of a member
       of the bar of this court at whose direction the service was made.

24      EXECUTED this 16th day of August, 2002 at Hermosa Beach,
California.

25

26                      Amy Schaffer

27

28

Exhibit 2

# I. PETER GLAUBER, PHYSICIAN, 67, DIES

## Psychiatrist Specialized in Disorders of Speech

Special to The New York Times

WHITE PLAINS, Dec. 10 — Dr. I. Peter Glauber, a psychiatrist and psychoanalyst who specialized in treating functional speech disorders, died of a heart ailment today in White Plains Hospital. He was 67 years old and lived at 121 Old Mamaroneck Road. He maintained an office at 829 Park Avenue in New York.

Dr. Glauber was consulting psychiatrist at Hillside Hospital in Glen Oaks, Queens, and consulting psychoanalyst for the Children's Village in Dobbs Ferry and for the Westchester Jewish Community Service. He received a medical degree in 1925 from New York University and taught clinical psychiatry there from 1942 to 1952.

After serving as attending psychiatrist and co-chief of the psychiatric clinic at Lenox Hill Hospital, from 1946 to 1949, he was supervisor of psychotherapy at the New York Psychoanlytic Treatment Center and chief of the speech division at the University Hospital psychiatric clinic.

Dr. Glauber was co-author of "Specialized Techniques in Psychotherapy," published by Basic Books in 1952, and "Stuttering: A Symposium," published by Harper in 1958. He was a fellow of the New York Academy of Medicine and American Psychiatric Association, a diplomate of the American Board of Psychiatry and Neurology, a former president of the Westchester Psychoanalytic Society and a member of the New York Psychoanlytic Society, the American and International Psychoanalytic Associations and the American Speech and Hearings Association.

Surviving are his widow, the former Helen Malmud; a son, Neil; a brother, Max Glauberman, and a sister, Mrs. Jack Gordon.

A funeral service will be held at 2 P.M. tomorrow at the Westchester Ethical Culture Society, 7 Saxonwood Drive.

*D R n Hanter*

*May 23, 1950*

## THE MOTHER IN THE ETIOLOGY OF STUTTERING

The nuclear etiologic factors in the stuttering syndrome
lie in specific elements in the personality structure of the
stutterer's mother.  This paper presents an exposition of these
elements and their arrangement in a series of increasing speci-
ficity.  Needless to say, there are many hiati in the knowledge
of choice of neurosis, especially in the lack of analytic material
on groups of mothers of children with related syndromes such as
tics, perversions, addictions, depressive and schizoid states,
all showing similar but not quite the same deficiencies in ego
organization.

The clinical material upon which this paper is based comes
from three sources, conclusions from which approximate each other
and point up similar basic elements mentioned.  The sources in-
clude:  the study of the family constellation of seventy-five
parents of stuttering children by the extensive method in the form
of diagnostic and therapeutic sessions of as many parents;
material from analyses of adolescent and young adult stutterers;
and finally, material from the analyses of the mothers themselves.

### I

### The Mother Within the Family Constellation

The following material, which is not a statistical summation
of genetic and characterologic data, was selected because it was
observed so uniformly that its significance appeared inescapable.

... the [...] material itself is highly specific qualitatively and be [...] it may be more so quantitatively. Undoubtedly, however, it is the carrier of more highly specific elements and thus may be regarded as a significant peripheral layer in the sea of [...].

To begin with, the mother's mother was usually a withdrawn, self-centered, psychoblemistic individual. Whether passive or active herself, she was always in part identified with some member of her immediate family who was or stood for an idealized active person. Our patients, the mothers, acquired the same idealization of activity which, however, always conflicted with an even stronger craving for passivity. This conflict originated very early in her life and remained outstanding throughout.

Usually her father was relatively passive and ineffectual; her mother often gave the appearance of martyrdom; and the marital relationship was hardly ever a happy one. Noteworthy was the compliant, ingratiating dependency upon her mother and her compelling need to win her approval and love, often attained by passivity or by slavish activity. The imitative identification was with her as well as with her ego ideal. The manner of expressing it depended chiefly upon whichever one her mother liked the better. Contradictions between her actual ego and her ego ideal were repressed and projected or rationalized.

Mother's relationship with her own father was similarly one of imitative identification though imitation of him was less slavish, partly because of the negative Oedipal factor, and also because her main attachment was to her mother, who was the more dominant parent

The father was frequently more liked as he was the less controlling parent and was occasionally actually allied with the children against the mother. When he was admired, daughter like mother envied him at the same time. Mother often dealt with her siblings as a mother substitute and acted toward her own father in the same fashion after her mother's death. It was noteworthy that from early life she related to her mother, father, siblings, and others chiefly by means of identification.

Her surface appearance varied. She might appear pleasant and outgoing, noticeably aggressive or passive, or very sweet and ingratiating, or else withdrawn. However, what was characteristic was the utilization of any one of these attitudes for controlling others.

Usually the mother encountered difficulties in choosing love objects and in maintaining these relationships; hence marriage, child bearing and rearing became charged with problems. To begin with, the object choice was unnatural. Often it was a choice "on the rebound". After having been in love for a long time with an older man, evidently the edipal model, she suddenly interrupted the relationship. "Somehow" she could not marry him or found an obvious rationalization. Conversely, one mother stated she knew instantly she was going to marry her husband when she first met him, despite the fact that he had a noticeably crippled nose. Of course it happened, not in spite of, but because of what this nose symbolized to her. Another mother always admiring older men, intellectual, active and accomplished, was unable to marry such a one but did marry an ineffectual man because, in addition to the

those for aggressive men, she could marry only on the basis of identification with her own unconscious ego ideal that of a passive, (sadistically) optimistic individual. She was the product of a very passive, retiring, self-indulging mother and a hard-driving father. Other mothers in this series married to men who became prominent suffered a diminution of self respect and of the sense of their own identity or "ego feeling", not adequate to start with. While they regarded their husbands with admiration, they thinly disguised their envy and rage.

These marriages can be described as sado-masochistic; on the surface the masochistic components were found more predominating and constant, the sadistic -- more infrequently and sporadic. The variable hostility patterns had the same basic aim: the need to possess and control husband and child, as one does an inanimate possession or a utility, or better still, an organ of one's own body; in other words, the aim of narcissistic union with the object. The child was often the recipient of frank aggression syphoned away from earlier objects -- self or husband. This fact explained the striking observation made fairly early in treatment of the comparative ease with which aggression was redirected to the earlier objects, resulting very soon in definite improvement in the stuttering child. In caring for these children, all the mothers experienced exasperation frequently exploding in rage. These reactions stemming from fear of separation were understandable in view of the over-extension of patience and placating efforts, plus the reactive negativism on the part of the children. Withdrawal and dependency leanings on the part of the husbands were additional

provocations for emotional outbursts as silent suffering of these mothers.

After a few years of such a marriage, the mother becomes aware that a radical change had come over her. She regarded herself burdened by the relationship which she experienced chiefly as a duty. The sexual life offered minimal satisfaction for which the husband was generally blamed because he poorly played the expected combined role of gentle mother and passive father. The home was occasionally referred to as a prison, hell, or cemetery. Some mothers could relax comfortably only if the husband and children were away and only then could they allow themselves to primp and enjoy feminine clothes before a mirror. Frequently there was a return to masturbation. Added to the masochism, other common symptoms which emerged were anxiety, hysterical states, insomnia, and depression. But there was evidence that these symptoms already existed before marriage but in a much milder form.

What has been described may be formulated in psychodynamic terms as follows: The majority of these mothers had had a relatively stable form of a schizoid character: these originally schizoid characters were objectively withdrawn and subjectively devoid of conscious pleasure. I have referred to them elsewhere as anhedonic.* By living in a close marital relationship the schizoid character was transformed into a less stable state showing anxiety, hysterical symptoms, and depression. However, their greatest emotional difficulties came to the surface with the birth of a child, a boy in eighty percent of the cases. Seemingly paradoxically, the pregnancy was generally enjoyed more than any

other life experiences. These difficulties revealed some of the underlying psychological conflicts. The labor was described in lurid, dramatic terms: she was "torn, ripped to pieces"; the damage seemed "irreparable". In some ways never she "never felt quite the same since".

The first year of the child's life was most frequently marked by some form of feeding difficulty, often serious, especially anorexia followed by forced feeding. At best, feeding was not smooth and steady; definite ambivalence about nursing and feeding could be discerned by observation. Occasionally the mother openly expressed one basis for it: a fear that the child would devour her. Weaning was difficult and prolonged. This struggle was only an aggravation of the prevailing feeding problem in which unconscious attempts at weaning were combined with efforts at forcing. The child cried a good deal, was more restless and over-active in comparison with his non-stuttering siblings. The opposite picture -- an unusual degree of inertness and anorexia -- observed less frequently, was associated with tenseness and shallow irregular breathing, and approached the clinical state of marasmus. The first year set the tone of the relation to the child: an increasingly burdensome anxiety about the care of the child and an increasing negativism on the part of the child. These difficulties continued into the second year and found new expression in the important problems of this age, particularly weaning, toilet training, locomotion, and beginning of speech. Added to the maternal anxiety there was a feeling of inability to cope with the child's problems, a desire for advice and an inability to follow it.

Characteristically, there was further maternal anxiety about the onset of speech. Consciously it was often expressed as a fear of delay in learning or a fear of indistinctness. The normal hesitations and deviations associated with the beginning of speech were met with tenseness. They were envisioned stuttering and its consequences in life time. Significantly, most of these mothers were speech conscious. Unconsciously, they equated good speech with aggressiveness; where after the former but feared the latter. Any activity, particularly one flowing from the child's own initiative -- whether it involved eating, speaking, elimination, or independent locomotion -- was regarded by the mother fearfully as equivalent to oral aggressive destruction of her and the environment, and was reminiscent of the expressed fear of being devoured during nursing. This fear increased as the speech became more incisive and more sharply directed to particular objects. By contrast, there was less fear of oral aggression in relation to the earlier echolalic or babbling speech and singing, both of which are less incisive and less directed toward objects.

In addition to the two findings just mentioned -- the mother's speech consciousness and her anxiety about her child's beginning to speak -- a third finding fitted into the picture -- the fact that very frequently either her brother, father, or husband stuttered. All of the husbands -- the fathers of the stuttering children in this series -- were interviewed, and what was noteworthy about them was the great frequency of cryptic stuttering among them. Mother's speech consciousness and the frequent presence of stutterers among the male members of her family were definitely

related to her object choice -- a man who often stuttered or was a hidden stutterer. These psychological facts were in contradiction to her usually ascribing maternal serenity with the exclusive cause of stuttering. In our opinion they dispose as well of the concept of the constitutionalists who regard stuttering as a sex-linked hereditary disorder transmitted by the female and affecting the male.

Beginning of school was the second important age for the onset of stuttering. This period was also the occasion of increased maternal anxiety. Thus there was a correspondence between maternal anxiety and onset of stuttering.

By this time the mother was definitely aware of a peculiar relationship with the boy. There was an irrepressible need to be involved with him accompanied with anxiety; an inability to handle him spontaneously and easily; an uncanny awareness of mutual strivings, provocations and negativism. Occasionally, hatred for the child was conscious; generally, however, this feeling was pre-conscious. Consciously, the feeling of love was strong and in the large majority of cases much affection and care were lavished. However, the constancy of the giving was always impaired by hesitation and anxiety.

## Recapitulation

So far it appears that this mother lived in a state of mental equilibrium as a result of cathecting object representations secured by distance from real objects. The representations are of

objects as phallic familial images and part-objects as passive images, and in these her own phallus plays a dominant role. Getting close to real objects -- husband and child -- produces a change in which the idiosyncratic elements become alloplastic. By virtue of that fact and its constant danger of separation -- anxiety emerged, other symptoms followed, along with efforts to restore the status quo. Thus there is a projection of early images of objects and of self upon husband and child. Further elaboration of this process will follow presentation of material from analyses of these mothers.

## II

## ANALYTIC MATERIAL FROM STUTTERERS

**The Mother Seen Through Reconstruction:** As was stated before, early identification with images of parental and familial objects and part-objects making up the unconscious components of the mother's ego structure are later projected upon husband and child. The child's self-image or images therefore reflect the maternal self-images. Analyses of the adolescent and young adult stutterer reveal a feeling of complete oneness with mother and a uniformly repetitious quest for the same feeling in all but the most casual relationship. On deeper levels, this quest in the form of excessive optimism and ecstatic moods could be found, especially in connection with escapist phantasies in relation to choice of vocation and vacations; the latter two, curiously, being often confused. Rarely, however, were these manifestations found on the surface. There, usually defence reactions guarded against repetition of his original identification with his mother and consisted of withdrawal,

pessimism, teasing and complaining, or sado-masochism. These reactions, while serving as defenses also offered instinctual gratification, thus resembling symptoms.

The underlying wish for identification was indestructible; its aim was passive or to be incorporated; its object -- the mother; and goal -- to attain identity with the narcissistic ego ideal -- the phallic mother. However it could be worked out, the body image of the subject in a state of separation was that of a part-object, an ablated breast or phallus. The body image of the object in the same state was that of a castrated individual.

Since they were one with mother, these stutterers were overtly not involved with them in any real way. Unmarried stutterers seldom mentioned them except in crises of breaking from them, and usually became strongly aware of them as individuals only toward the end of the treatment. Among the married, this fact constituted a basis for marital difficulties which they found extremely hard to recognize as the identification was completely repressed.

The following is an instance of the phallic identification and its masochistic expression. A twenty-five year old girl, who was in analysis because she stuttered, was negative and quarrelsome. She was embattled with her mother, who was an infantile and aggressive woman, who blocked her daughter's normal activities. Self-expression meant to the patient to be a phallic person, and this wish was hinted at in her stiff bearing and in her boyish dress, coiffure, etc. But to act out such aggressive identification more fully in her daily life would be tantamount to being destructively aggressive. Fear of this, and fear of retaliation, led to inhibition of activity, even activity in the service of essential passive

feminine identity.  In her passivity the animal represented the same,
but now the body-phallus fantasy represented a wish to be touched,
i.e., incorporated.  Passive and active aims both meant danger in
different ways and were inhibited.  Therefore her behavior is all
anal or muscle denial; ... was blocked.

The setting of the instance to be described was the emergence
of affectionate feelings toward the analyst which she feared would
trap her into a relationship which would expose her and hurt her.
These feelings enabled a conflict symbolized by a wish to be incor-
porated and a wish to be ejected.  The conflict was acted out in a
curious way on the day following an analytic hour in which she
came close to expressing positive feelings.  She commuted to work
from a nearby suburban town.  Occasionally when she had to stand
she remarked to the conductor, "No seat, no ticket."  A few times
he did not trouble her further, at other times he found her a seat.
One morning of that particular day when she made the same remark
the conductor insisted that she show her ticket, and she was equally
adamant in her refusal.  Thereupon he signaled the train, an express,
to stop at the next local station and ejected her from the train.
She felt hurt and humiliated; was furious and angry at the passi-
vity of the other commuters.  But at the high point of the exper-
ience she felt strangely elated, felt like crying, and heard herself
exclaim with mixed feelings, "And I let him do this to me!"  Dis-
cussing this episode at the next hour she made a slip of the tongue.
Consciously she wanted to say, "I would have taken my seat.", but
instead she said, "I would have taken my ticket."  She added she
was not really interested in being given a seat that morning.

Apparently that did interest and elate her one to attain and in reaction to her passive attitude; her "standing out" approximately expressed her phallic body-image and its passive, exhibitionistic aim as well as touched and incorporated. But passive incorporation a [illegible] reaction, a provocation. It retained for her fulfillment of the wish to be touched or incorporated symbolically. The symbolic incorporation could be secured through an actual ejection where the latter might be considered a defense against an actual incorporation. Again we see the substitution of object representation cathexis for object cathexis.

That was the same wish she had in transference where she regarded the analyst alternately as an ideal loving mature or phallic mother and a hostile, rejecting one. Of the two images, she regarded the latter as the more real, the one she had more experience with in provoking her mother and defending herself against her. She was aware of her oral aggression in the form of her quarrelsomeness, regarded the trait and herself as one, equally unattractive. She was certain no one of her boy and girl friends could like her steadily and that she would ultimately be left out -- ejected or expelled.

Her deepest phantasies were hinted at in some of her behaviors it was hard for her to adjust to time in appointments and arrangements. She acted as if time were endless. Relationships with friends and transference were treated and spoken of jokingly as if they did not seem real or did not matter. The wish for identification by losing herself, or her own identity, in that of another was shown in her inability to plan her budget realistically. She wanted

to run up a debt the way analysts do. The treatment inevitably involving sucking, traumatic and crying suggested the pathological optimism stemming from identification with the incorporated breast which was also responsible for the inadequate sense of reality. Furthermore, she used her analysis's preoccupation for separation from treatment and flirted with the idea. She phantasied the aim of expulsion, though painful, as permanent her original aim to be touched or impregnated which she felt to be more painful and ultimately leading to expulsion. The change represented a kind of short circuiting of expected events, or the familiar defenses against a traumatic experience by a shift from the passive to the active role.

This shift can be understood on another level as a wish for identification with the actual mother, where the touch represented an acquisition of a charge of aggression. This cathexis resembled libido cathexis in one important respect, namely, that it, too, can constitute a defense against what is perhaps the greatest fear: deep regression to passivity.

The combination, of course, represents an important aspect of sado-masochism. As observed in this patient, and in other stutterers, sado-masochism expresses a defense against identification with the phallic mother, aggressively conceived. At the same time it is also a gratification of this identification in regressive terms, where the ego acquires sadistic cathexis. It is thus a defense as well as an instinct derivative.

Incidentally, sado-masochism is common among stutterers. It is observed when they are engaged with, what is for them, a struggle to attain and maintain total-object relations. When they are not

engaged in this struggle, which becomes frequently either as a fixed state or periodically, i.e., when they are detached from objects and are in the more simply somnotic state, they are not sado-masochistic. They then experience? they are devoid of conscious pleasure which they enjoy automatically through representation, but they do not suffer pain.

A second patient, a male bachelor of thirty, returning after a trial interruption, began the hour by saying: "What I need is an earthquake... I mean an explosion or an eruption, a shot out of hell, or out of the blue, something violent." In his analysis, he hardly ever mentioned his mother, was much involved with his father for being a very dependent frightened man who retired before fifty, led a life of a substitute housewife and preached to his son dependence upon strong men, ingratiation and unobtrusiveness, "marrying the boss' daughter", etc., as techniques for success. He resented this style of behavior in his father, his being a poor example, and his preachments. In addition he remarked that he saw no difference as regards these attitudes between his father and his mother. She accepted his way of life, did not contradict his preachments, perhaps even encouraged him. If anything she was stronger than his father. At his work, however, he behaved as if he put into practice all the attitudes of his father. He kept a position which he regarded as inferior, looked upon the firm as a family group in which he was also identified with its head, a woman. He behaved sado-masochistically towards her, but did nothing realistically to advance himself either in this position or in any other.

He regressed during one of his recurring periods of despondency over his lack of progress in his jobs. In the past, the analysis of similar periods disclosed the emergence of passive wishes whenever it came to plan and initiate some constructive activity in the various areas of his life. When it came to act, he would virtually always say, "But when do we start." He did the same this time as he spoke of his lack of courage and confidence and his inability to see or to know where he was going. He began, "Let us -- you and I --", then recognizing his use of "us", added with feeling, "That's the hell of it." The "us" signified the wish to maintain identity on the primitive level of symbiosis or appersonation. That was the "hell" he wished to be shot out of and be [illegible] God or [illegible] -- but passively. The trial interruption activated the weaning trauma which was essential for proving how he handled it, namely, by incorporating the breast and becoming identified with it.

His passivity followed from his body-image of breast, later phallus, in union with the phallic mother. Separation, then, was indiscriminately felt as a hostile act. Even separation in the interest of growth by permission for active identification with an adult role was felt as hostile to the only meaningful ego image -- that of being one with the phallic mother. It was a hostile act to be separated from that unity and it was at the same time "hell" to remain in regression in the status of an organ (part-object) within an organism. To be separated meant to be ejected into an aggressive world as a passive organ not yet sufficiently cathected with either libido or aggression to be able to function as a definite organism. It was in this situation that he asked to be pushed out violently.

It was [illegible] [illegible] of the first
patient [illegible] from the brain and the amygdala.

[illegible] determinant in the maternal identity of these obstetrical [illegible] the fact in the social relationship of the large majority of the patients. They were [illegible] preoccupied with their mothering role in active play as in activities which they themselves planned or supervised. Whereas when they were not in virtual flight from these when they [illegible] to their wives' care, the quality of their involvement, especially their oversolicitude and overprotectiveness, implicated or approximated the role of the mother as just described. Other examples of the psychological similarity have been mentioned.

### III

#### Case Histories: Fragments of Clinical Material from Analyses of Mothers

Case I: The patient was a thirty-five year old mother of two girls of thirteen and ten. The younger one stuttered since she began to speak, and during the last year, masturbated openly at home and school. The patient suffered from chronic depression which she, more or less, accepted with resignation.

The mother, who was the youngest, had one brother and two sisters. Both of her parents were detached individuals -- her mother was narcissistic, beautiful, perfectionistic. Our patient saw her regularly but did not feel very close or maternal in her presence. Her father, self-absorbed in his artistic work as a painter, died when she was twenty. Our patient related herself to all members of her family and especially the parents by means of

children appeared as boys.  She enjoyed lyric poetry which was "pure" and dehumanized, also nihilistically disturbed tales like "Alice in Wonderland" to a morbid degree.  As will be detailed later distortion was equated with castration.

The patient reacted to masturbation of her daughter with anxiety, was unable to observe any related details, to comprehend discussion, or to take any steps regarding this problem.  She thus repeated the repression of her own masturbation when this problem recurred in the life of her child.  As she never spoke of her own masturbation directly, her reaction to the behavior of her child was the nearest light she shed on it, a form of acting out.  She often acted in the analysis as if it were a fencing match, and she sometimes implied as much.  After the analyst would interpret some bit of her behavior, she would exclaim "Touche".  Her child's open masturbation was like her own phantasies, a bid for love, similar to a magical gesture, as the father was withdrawn and the mother, our patient, ambivalent.  This explains why the open masturbation ceased when the parents, in recognition of the child's expressed wish for more positive and consistent attention, became more affectionate and more constant.

The following series of identifications or equations were thus established:  the child's open masturbation = the mother's phantasies = transference behavior.  The activistic components in all were exhibitionistic as well as provocative and could be regarded as expressions, like magical gestures, representing a plea or bid for passive incorporation.  What was exhibited in each instance was the phallus, symbolized by the body, belonging to the object chosen

for the instinctual striving. Yet the object of the sexual striving was not only the phallic mother. Ultimately it was the self, the finding of the self as object for narcissistic investment.

Her enjoyment of lyric poetry was already mentioned, but words in general had for her a unique value in themselves. She enjoyed their dimensions, sound and shape; or was acutely pained by certain words or their usage. To her words were objects of love and hate. On one occasion she compared the disappointment in an expected book -- "It's verbiage" -- to the giving birth of children who were born lifeless or deformed. Her children were thus a disappointment and felt to be deformed or distorted -- castrated boys. This fact also suggested a possible explanation of her fascination for such tales of distortion and nihilism as "Alice in Wonderland". The fact that expressed words had such meaning to her and produced such effects is further proof of the body-phallus identity and that words were equated with phallus and phallic emanations -- emissions and children felt to be products of aggression which, later sexualized, rendered them sadistic. This state is in contrast to phallic union in which aggression is fully integrated or fused with libido.

Identification with parents felt to be aggressive and who could stimulate so much aggression (especially the idealization of a dead parent the reality of whose death has not been sufficiently assimilated) cannot be understood except by the assumption of the functioning of predominant mortido drives. This explains why the patient's main symptom was depression and why she sometimes referred to her home as a prison and a cemetery. She was an example of Freud's statement that there are individuals in whose instinct

constitution there is a preponderance of the death instinct.

Her choice of objects for identification and her manner of attaining it caused the aim of her instinctual striving to be the most regressive and destructive. The other mothers differed from her to the extent that their objects were regarded less destructive, though their aim was approximately the same; to lose their own identity, or never fully attain it, and sleep. Of course, the degree of awareness of the aim and the strength of the repression made an important difference in each case. In this mother sleep meant death mainly, though the wish for rebirth was suggested. The reverse was true in the others. For them infantile omnipotence and pleasure spelled freedom from anxiety and tensions of all kinds, especially separation anxiety. Thus it was a return to the sources of libido in the id.

Incidentally, after the conclusion of the analysis it was learned independently that the mother of this patient frequently told of her many and gruesome attempts to abort when pregnant with the patient. It brought to mind the paper by Ferenczi, Das Unmillkommene Kind und sein Todestrieb. (Int. Ztschr. f. Psa. Vol. 15, 1929). Therein he states that these children noticed their mothers' unconscious impatience which negatively influenced their desire to live.

In summary, this mother demonstrated deeply regressive, intrauterine drives, the accent being primarily on mortido cathexis. Phallic phantasies and behavior suggested the phallic body image, the genesis of which were the both parents -- frustrating and distant.

depressive quality in her manner.  She enjoyed thinking things through.  She had a university training which she earned herself, was a good teacher, a successful and respected civic worker in her community.  Though face was important to her she could cry fairly easily when depressed during her analytic hours.

As was the case with the first patient, a considerable part of the analysis dealt with her unhappiness in observing and dealing with the problems of her daughters, especially the elder daughter, J., who stuttered.  The girl was unhappy, a poor mixer; looked gawky and wore glasses.  She was intellectually superior, did well in school with little effort.  The mother wished her to go out with boys, yet the thought of her daughter petting threw her into a state of anxiety and confusion.  She feared the results of inhibiting the girl as well as the results of any indulgence.

As an illustration of the latter, she told the following incident:  When J. was a little girl of pre-school age, she once told her mother that a boy of her own age "touched bottoms" with her and that she might have a baby.  Recently she mentioned to a girl friend that she might have a baby.  It was difficult to ascertain whether J. had a delay in her menstruation, whether she merely repeated the infantile idea, or was acting out a phantasy. The mother was certain after talking with J. that there was no basis for concern.  Yet she was in a panic about the rumor spreading among the girls and boys who knew that J. was occasionally seen with a supposedly undesirable boy.  She was completely devoid of humor about this matter; was seriously considering discussing it with some of the mothers in the neighborhood, yet could not.

She was unable to be helpful to her daughter in a spontan-
eous and natural way when J.'s seemed furtive and preoccupied.  She
resented J.'s absorption in books and her liking to be waited on
at home.  She was annoyed by her shyness.  She wanted her to be
more active and outgoing on public occasions and in sports; urged
her to be in the school band and bought her an expensive clarinet.

Patient saw in her daughter's passivity and shyness resem-
blances of important traits of her mother, her husband, and a cousin
of his who was mentally ill.  The reference to the mental illness,
the exaggerated concern about J.'s wearing glasses, and the fear of
social ostracism occurred at the time she was concerned about J.
going out with a boy from the neighborhood considered by her to be
socially inferior.  It was clear that she was anxious about the
consequences of sexual stimulations, particularly masturbation as
well as the girl's developing feminine sexuality in general,
equating both with castration and social inferiority.  The anxiety
was maintained because, though consciously she strove to be en-
lightened about her daughter's growth, identified herself with it
and did not inhibit her, unconsciously she felt guilty and feared
consequences.

Her wish to comply with her own feminine drives and thus
become different than and separated from her infantile mother led
to fear of "realistic consequences" of imaginary castration and
realistic ostracism.  This fear antedated the later oedipal anxiety
with which it combined.  The anxiety was maintained as long as J.
postponed or refused to adopt her mother's defenses:  her activi-
stic social behavior -- being a civic worker, planner, manager and